22217

The STATE, Respondent, v. Donald Henry GASKINS, Appellant.

(326 S. E. (2d) 132)

Supreme Court

108

*W. Gaston Fairey* and *Jack B. Swerling*, Columbia, *for appellant.*

*Atty. Gen. T. Travis Medlock, Asst. Attys. Gen. Harold M. Coombs, Jr.,* and *Carolyn M. Adams,* and *Sol. James C. Anders,* Columbia, *for respondent.*

Heard Sept. 12, 1984.

Decided Jan. 22, 1985.

*Per Curiam:*

This appeal is an appeal from the conviction and death sentence of Donald Henry "Pee Wee" Gaskins for the murder of Rudolph Tyner. Many errors of law are alleged to have been made by the trial judge. This appeal arises because of exceptions taken and because of our statutory mandatory review in all death penalty cases. We affirm both the conviction and the death sentence.

In 1979, Rudolph Tyner was tried and convicted of the murder of Mr. and Mrs. William B. Moon. He was sentenced to death by electrocution and was, at the time of his death, housed in a cell on death row at Central Correctional Institution at Columbia. The Appellant Gaskins had plead guilty to eight counts of murder and was serving life sentences on September 12, 1982, when Tyner was murdered. Gaskins was also incarcerated at the Central Correctional Institute in Cell Block 2 (CB-2) and was acting as building or maintenance man for the death row area. This gave him considerable freedom to move about attending to chores in this cell block area. Gerald McCormick was also a prisoner and was a friend of Gaskins.

Tony Cimo was the son of Mr. and Mrs. Moon and was unhappy with the fact that Tyner continued to live. He inaugurated a plan to have Tyner killed on death row. Cimo procured the assistance of Jack Martin who lived in his same general area in Horry County. Gaskins, Cimo and Martin planned their strategy over the telephone for bringing about Tyner's death. Gaskins had limited use of the telephone and recorded on tape cassettes several conversations which took place on February 23, 1982, July 9, 1982, July 14, 1982, and on one other unspecified date. In these conversations he discussed his unsuccessful efforts to poison Tyner and the possibility of killing Tyner with explosives concealed in a radio. In each of these telephone calls Gaskins wrongfully identi-

fied himself to the operator as Gerald McCormick. Both Cimo and Martin referred to him in the conversation not as Gerald McCormick, but as "Pee Wee" which is the nickname of Gaskins. The voice on the cassettes was identified as that of Gaskins.

The evidence revealed that Tony Cimo first contacted Jack Martin in an effort to hire an assassin of Tyner. Initially Martin contacted Gerald McCormick in August 1981. Thereafter, McCormick and Martin contacted Gaskins and developed a plan to poison Tyner. The poison did not accomplish its purpose and they thereafter resorted to smuggling explosives into the prison.

The State's chief witness was prisoner James Brown, a convicted murderer residing in the death row cell block. He was a "work out," i.e. he had limited liberties for chores such as taking meals to prisoners in death row cells. He worked somewhat under Gaskins who designated him chores. He testified that on several occasions Gaskins directed him to deliver items to Tyner such as marijuana cigarettes. On September 12th Gaskins had prepared what appeared to be a radio-type speaker built into a plastic cup. In the bottom of the cup there was a female electrical socket adapted to be plugged in with an extension cord.

On this date, a few minutes before the explosion which caused Tyner's death, Gaskins instructed Brown to deliver the cup to Tyner and to give Tyner a message that "the wire was in the bottom vent in his cell." Brown further testified that Gaskins said Tyner would know what to do with the wire. Gaskins' and Tyner's cells adjoined such that one air circulation vent served both cells. One inmate could yell through the vent from his cell to the other. This is the vent referred to in the message sent by Gaskins to Tyner. It is the theory of the State that Tyner had been led to believe that connecting this cup-speaker to the wire would enable Gaskins to talk to Tyner without yelling through the vent. When Tyner plugged the wire into the bottom of the cup, an explosion occurred which blew off a portion of Tyner's head and severed a hand from which he died soon after being transferred to the institution hospital.

Brown testified that right after the explosion, he went to Gaskins' cell and saw Gaskins pulling a wire from the bottom

vent in his cell. A few moments later he heard Gaskin's toilet flush. Gaskins came out of his cell and went downstairs.

Dr. Edward W. Catalano, a pathologist, testified that Tyner died as a result of the impact of explosives held near his left shoulder and head.

Gaskins exercises his Fifth Amendment privilege of not testifying, but submitted several prisoner witnesses mostly relative to his whereabouts at the time of the explosion.

Counsel for Gaskins submits that the trial judge committed numerous errors of law in conducting the trial and that he is entitled to a new trial. The first of these deal with the jury selection process.

## I.

Gaskins first contends that the trial judge erred in excusing prospective juror Robert G. Copeland for cause under *Witherspoon v. Illinois*, 391 U.S. 510, 88 S. Ct. 1770, 20 L. Ed. (2d) 776 (1968). We disagree. The juror indicated that he did not believe that he could really consider the death penalty and consistently maintained his opposition to the death penalty throughout the *voir dire* examination. He specifically stated, "So I don't think that the seriousness of the crime would affect my opinion." The trial judge found that Mr. Copeland was irrevocably opposed to the death penalty and accordingly disqualified him from service. Where a trial judge has a reasonable basis to conclude that a prospective juror would be unable to faithfully discharge his responsibilities as a juror under the law, that decision will not be disturbed. *State v. Linder*, 276 S. C. 304, 278 S. E. (2d) 335 (1981).

## II.

Gaskins next argues that the trial judge erred in refusing to excuse for cause jurors James Q. Cecil and Robert T. Doster, foreman, because they indicated that Gaskins should have received the death penalty for his prior convictions. We disagree.

The *voir dire* must be examined in its entirety. *State v. Spann*, 279 S. C. 399, 308 S. E. (2d) 518 (1983); *State v. Gilert*, 277 S. C. 53, 283, S. E. (2d) 179 (1981); *cert. denied*, 456 U. S. 984, 102 S. Ct. 2258, 72 L. Ed. (2d) 863 (1982).

Throughout the *voir dire*, Mr. Cecil and Mr. Doster maintained that they could give a fair trial to both the State and to Gaskins. Neither of them expressed any dogmatic opinion about the imposition of the death penalty. Although both jurors stated they believed Gaskins should have received the death penalty for the earlier murder convictions, they each stated that they had no opinion about his guilt or innocence in the present case, and that this case was separate from the earlier ones. When the *voir dire* of these jurors is examined in its entirety, we conclude that no bias or prejudice was shown against Gaskins in qualifying these two jurors.

### III.

Counsel for Gaskins next submits that the trial judge erred in excusing Michael E. Gaffney and Willie L. Robinson,[1] because they were not mentally capable of performing their duties as jurors. The trial judge ruled both jurors were disqualified under § 14-7-810(3) of the *South Carolina Code of Laws* (1976).

Both of these jurors gave inconsistent answers about their views of the death penalty and displayed an incredible lack of understanding of the trial process. Both Robinson and Gaffney revealed an inability to follow directions and a similar inability to grasp the judge's discussion. Gaffney did not appear to understand the principle that a defendant is presumed to be innocent until proven guilty by the State. Likewise, Robinson stated that he would go along with the majority of jurors in both the guilt and the sentencing phases of the trial.

The manner and bearing of the prospective juror are elements which may be properly considered by a trial judge in deciding whether that juror is qualified to serve. *State v. Middleton*, 207 S. C. 478, 36 S. E. (2d) 742 (1946). A juror's competence is within the trial judge's discretion and not reviewable unless wholly unsupported by the evidence. *State v. Spann*, 279 S. C. 399, 308 S. E. (2d) 518 (1983). We find no error in the trial judge's ruling.

---

[1] The appellant's brief states Clarence R. Jackson rather than Willie L. Robinson, but cites Transcript pages of *voir dire* for Robinson. The arguments are obviously addressed to the disqualification of Robinson.

## IV.

Gaskins argues that the trial judge erred in excusing James Josey and Bernice S. Folsom because of their bias against him even though Gaskins was willing to waive any objection to their bias.

Both jurors expressed the belief that Gaskins was ██ guilty but indicated they would be opposed to the death penalty despite their opinion of his guilt. The trial judge excused both jurors believing that neither could give Gaskins a fair trial. A trial judge has a duty to assure that every juror is unbiased, fair, and impartial. *State v. Holland,* 261 S. C. 488, 201 S. E. (2d) 118 (1973). Additionally, Mr. Josey expressed an unfaltering opposition to the death penalty. In addition to his bias displayed against Gaskins, Josey would not have been capable of giving the State a fair trial. Likewise, Ms. Folsom indicated her opposition to the death penalty as well as her conviction of Gaskins' guilt. A defendant only has a right to a trial by a competent and impartial jury and no right to a trial by any particular jury or juror. *State v. McDaniel,* 275 S. C. 222, 268 S. E. (2d) 585 (1980); *State v. Rogers,* 263 S. C. 373, 210 S. E. (2d) 604 (1974).

Gaskins argues that he should be allowed to exercise ██ the strategy of seating jurors who were convinced of his guilt but opposed to the death penalty. He asserts that he is entitled to waive any objection he might have about prejudice so long as the prejudice does not extend to the State's position. We disagree. A defendant cannot waive the right to a fair trial unless he pleads guilty. Additionally, a juror who cannot impose the death penalty cannot render a verdict of guilty according to law pursuant to § 16-3-20(E). Both of the jurors were biased against Gaskins and opposed to the death penalty. Therefore, they are not qualified to serve as jurors and were properly disqualified.

## V.

Gaskins further contends that the trial court erred by refusing to strike two jurors, Ernest E. Rhyne and Carolyn Richardson, because they indicated they would not seriously consider life imprisonment as an alternative to the death penalty. Gaskins argues that he had to use two peremptory strikes for these jurors and was thereby prejudiced. This

argument is without merit. Both jurors stated that they had not reached any conclusions as to Gaskins' guilt or innocence. When questioned about the death penalty, each one explained that they could impose the sentence if the circumstances warranted it, but was not predisposed to give the death penalty in every case. Additionally, both jurors stated that they would follow the instructions of the trial judge.

In order to be qualified to serve on a jury in a capital case, a prospective juror must be able to reach a verdict of either guilty or not guilty and, additionally, if warranted, vote for either sentence. *State v. Plath*, 281 S. C. 1, 313 S. E. (2d) 619 (1984). Each of these jurors indicated that he could consider all of the evidence, reach a verdict, and impose a sentence according to the instructions of the trial judge. We find no error in the qualifying of jurors Ernest E. Rhyne and Carolyn Richardson.

## VI.

Gaskins charges that the trial judge erred in refusing his motion to suppress items taken from his cell without a warrant because the search and seizure was unreasonable and forbidden by the Fourth Amendment to the Constitution of the United States.

Gaskins' cell adjoined Tyner's wherein the killing took place. After the death of Tyner, Gaskins was transferred to maximum security because he was a suspect. He was directed to take all of his personal belongings from his cell and put them in a laundry cart to be taken to the contraband control office. In inventorying the items, prison officials discovered a telephone jack, earphone, a soldering iron, and electrical wires. They also found a Panasonic tape recorder, a wrench, pliers, screw drivers, light bulbs, and extension cord, and a disassembled cassette recorder. There were also thirty-eight cassette tapes, a radio, a torn speaker, plastic fan blades, double-edged razor blades, marijuana and electrical cords.

The cassette tapes had recorded conversations between Gaskins and Martin and Gaskins and Cimo. Among the things discovered was an address book. Lieutenant Tallon of the South Carolina Law Enforcement Division and Officer Waters interviewed Gaskins on October 1, 1982 at the Kirkland Correctional Institution Infirmary. Gaskins told

him that he had been a good friend to Tyner. He showed them a maroon colored address or date book. In opening the book to give Gaskins a letter which was inside, Officer Tallon saw the word "Tony" and a phone number which he recognized as that of Tony Cimo. It was seized.

We are of the opinion that the search and seizure of ■ those items found in Gaskins' cell as well as the address book and their introduction into evidence at the trial were proper. While we have held in *State v. Ellefson,* 266 S. C. 494, 224 S. E. (2d) 666, 668 (1976) that a prisoner does not lose all of his constitutional rights by reason of being incarcerated, at the same time a prisoner by reason of his very status does not retain all of the rights available to free persons in our society. The rights of a prisoner are fully discussed in an able opinion by Chief Justice Warren E. Burger in the case of *Hudson v. Palmer,* _____ U. S. _____, 104 S. Ct. 3194, 82 L. Ed. (2d) 393 (1984) and in *Block v. Rutherford,* _____ U. S. _____, 104 S. Ct. 3227, 82 L. Ed. (2d) 438 (1984). In *Hudson,* the Chief Justice enumerates many of the rights reserved for a prisoner. We hold that the search was reasonable; Gaskins had no right of an expectation of privacy and the exigencies of the circumstances warranted the action taken by the prison authorities.

The test of reasonableness is not capable of a precise ■ definition. In each case there is required a balancing of the need of the particular search against the invasion of personal rights. The courts must consider the scope of the particular intrusion and the manner in which it is conducted as well as the justification for initiating it. At the time of the search, prison authorities were aware of the fact that a contraband explosive had been brought into the cell block. It became their duty in the interest of prison security to protect the rights of other inmates by solving the crime and to do everything reasonably possible to find the culprit and remove other explosives if any there be.

## VII.

Counsel for Gaskins submits that the trial judge erred ■ in restricting the cross-examination of State's witness James Brown as to other incidents similar to the case at trial to which he had given contradictory statements.

Brown testified that he, at Gaskins' request, delivered a plastic drinking cup with a speaker in the top part and a female electrical connection in the bottom part to Tyner a few minutes before the explosion and the ensuing death. He was questioned in October and, upon the advice of counsel, did not reveal that which had happened. Later in Janurary 1983 upon further advice of counsel he revealed that he had in fact delivered the instrument without knowing what it was. He admitted his inconsistent statements and admitted that he was serving two life sentences for two separate murders. The only purpose of the testimony which was excluded could have been to attack his credibility. He further admitted that he did not always tell the truth. He impeached himself. Assuming, *arguendo*, that the trial judge erred by so ruling, any error was harmless in view of Brown's admissions during cross-examination that he had fabricated stories and told lies in the past. Argument on this point is without merit.

## VIII.

Gaskins next contends that the trial judge erred in his ruling on the scope of defense counsel's direct examination of his own witness John Caison. The exact question which Gaskins' counsel sought to ask Caison during direct examination was asked by the State and answered by Caison during cross-examination. Error in the exclusion of evidence is not prejudicial where its effect would have been merely cumulative. We find no error.

## IX.

Counsel for Gaskins submits that the trial judge erred in failing to require witness Cole to take the stand in order to assert his Fifth Amendment privilege not to testify. We are of the view that his ruling is inconsistent with *State v. Perry*, 279 S. C. 539, 309 S. E. (2d) 9 (1983) and *State v. McGuire*, 272 S. C. 547, 253 S. E. (2d) 103 (1979) wherein the Court held:

> [A] judge may not invoke a witness's Fifth Amendment privilege; and, in any case, it is well settled that *a witness who is not also a defendant can invoke the privilege only after the incriminating question has been put.* [Emphasis added.]

*State v. Perry, supra* 309 S. E. (2d) at 10.

At the same time, we are of the opinion and find beyond a reasonable doubt that the error was harmless. For a discussion of harmless error see *State v. Truesdale,* Opinion Number 22176, Davis' Advance Sheet No. 52, filed October 31, 1984. In the absence of the jury, Cole was questioned before being excused. The gravamen of the testimony sought is reflected in questions and answers as follows:

> Q [By Defense Counsel] MR. COLE, YOU HAVE INDICATED TO US IN THE PAST THAT YOU KNEW WHERE MR. GASKINS WAS AT THE TIME OF THE EXPLOSION, IS THAT CORRECT?
> A YES, SIR.
> Q AND HE WAS ON THE TIER?
> A YES, SIR.
> Q AND AFTER BEING ON THE TIER AFTER THE EXPLOSION, HE WENT DOWN TO THE ROCK? IS THAT CORRECT?
> A YES, SIR.

Cole was one of several prisoner witnesses who testified relative to what took place immediately or soon after the explosion. His testimony would have been cumulative at most and we are convinced that the error on the part of the judge in failing to require him to take the stand was harmless beyond a reasonable doubt.

## X.

Gaskins submits that the trial judge committed reversible error by injecting personal opinion and improperly commenting on the facts of the case, and also in interfering with his right to a fair trial by interrupting and interfering with the questioning of witnesses throughout the trial. There is no question but that a judge is entitled to participate in the trial of a case. It is only when and if his participation prejudices the accused person's right to a fair trial that a new trial must be granted. The duties and limitations of a trial judge are stated by Mr. Justice Hydrick in *State v. Anderson,* 85 S. C. 229, 67 S. E. 237, at 238 (1910) as follows:

A grave responsibility rests upon a trial judge. It is his duty to see to it that justice be done in every case, if it can be done according to law; and, if he thinks that the attorney for either party, either from inadvertence or any other cause, has failed to ask the witnesses the questions necessary and proper to bring out all the testimony which tends to ascertain the truth of the matter under investigation, we can see no legal objection to his propounding such questions; but, of course, he should do so in a fair and impartial manner, and should not by the form or manner of his questions express or indicate to the jury his opinion as to the facts of the case, or as to the weight or sufficiency of the evidence.

In the following cases it was held that the Court's examination did not constitute prejudicial error: *State v. Atkinson,* 33 S. C. 100, 11 S. E. 693; *State v. Jackson,* 87 S. C. 407, 69 S. E. 883; *State v. Hyde,* 90 S. C. 296, 73 S. E. 180; *State v. Mitchum,* 150 S. C. 341, 148 S. E. 184.

This was a long, drawn out case involving many issues. From a review of all of the participation alleged to be prejudicial cited by counsel, we conclude that the trial judge did not participate in the trial beyond that permitted by the precedent established in this State.

## XI.

Next Gaskins contends that a fair trial was denied him because of the solicitor's argument concerning certain evidence being undisputed. He argues that this was an improper comment on Gaskins' failure to testify. Defense counsel did not object to this argument. We disagree.

Any alleged error on the part of the solicitor's closing argument must be viewed in the context of the entire record. The accused person bears the burden of demonstrating that the argument denied him a fair trial in the determination of his guilt or innocence. The record reflects Gaskins received a fair trial, and he has not established that the argument was prejudicial. In context of the entire record and its overwhelming evidence of guilt, even if the argument were improper, it was harmless error beyond a reasonable doubt.

## XII.

Gaskins submits that the trial judge erred in instructing the jury on the presumption of malice. His charge in relative part is as follows:

> Malice may be presumed or implied from the willful deliberate and intentional doing of an unlawful act without just cause or excuse; but if facts proven are sufficient to raise a presumption of malice, such a presumption may be rebutted or overcome by other evidence. And then it is for you, the jury, to determine from all the evidence whether or not malice has been proved beyond a reasonable doubt. I charge you further that while malice is presumed from the use of a deadly weapon or from a dangerous instrument—that while malice may be presumed from a deadly weapon or from a dangerous instrument yet where circumstances relating and surrounding the incident are brought out, then the presumption vanishes and malice again must be proven to you beyond a reasonable doubt.

This was the conventional charge used without contest over the years. In more recent rulings of the United States Supreme Court and in turn rulings by this Court, it has been held that use of the words "presumption," "rebuttable," "reasonable explanation," and "unless the contrary be proved" are unacceptable. It would appear at first blush that reversible error is present. *See State v. Elmore*, 279 S. C. 417, 308 S. E. (2d) 781 (1984) and *State v. Lewellyn*, 198 S. C. 199, 314 S. E. (2d) 326 (1984). Harmless error does not require a new trial.

Murder is defined by § 16-3-10 Code of Laws (1976) as follows: "Murder is the killing of any person with malice aforethought, either express or implied." While malice is a necessary ingredient of murder, it is not relevant until and unless it be found that the accused person did in fact wrongfully kill the victim. Here the jury has found that Gaskins killed Tyner. There are only four ways in which Tyner, or any other person, could die: (1) suicide (2) accidental death, (3) natural causes, and (4) at the hands of another. There has never been any contention throughout the trial of this case, on anyone's part, that the killing was suicide,

accidental or from natural causes. Patently, Tyner died at the hands of another, found to be Gaskins. When one is found to have wrongfully taken the life of another, the element of malice becomes important in determining the degree of unlawfulness. If the unlawful killing is without malice, the offense is reduced to manslaughter under § 16-3-50. If the unlawful killing is through criminal negligence, the offense is involuntary manslaughter under § 16-3-60. If the killing is in self-defense, there is no crime. Here the offense is murder or nothing.

The question we are called upon to answer is: Did the ailing instruction on the issue of malice so infect the entire trial that the resulting conviction violates due process? Stated another way: Might the charge considered as a whole be interpreted by the jury as shifting the burden of proof on the element of malice to the accused? Or still another way: Might the jury have relied on the presumption rather than the evidence?

> I charge you first of all that it's a cardinal rule of law that everyone who is charged with a crime is presumed to be innocent until proven guilty by the state beyond a reasonable doubt. No defendant has to prove his own innocence. He is presumed innocent. And the state has the entire burden of proving to you beyond a reasonable doubt that he is guilty.

> and

> The state has to prove along with all the other elements of any crime that he was there actively participating in the crime either actually or constructively present.

> and

> I told you earlier when we drew the jury that the defendant did not have to testify. He doesn't have to offer any evidence. The fact that he did not testify should not enter into your deliberation in any manner. You should not consider that because he has plead not guilty, the burden is upon the state to prove him guilty beyond a reasonable doubt.

In addition to the facts cited hereinabove, the jury had before it evidence of Gaskins' attempt, but failure, to poison Tyner. After he had failed in his effort to kill by poisoning, he talked in a recorded telephone conversation with Cimo which is in evidence and said of the followng:

> GASKINS: It just make 'em sick as hell and that's it. So, I come up with something, told him [Referring to Gerald McCormick] that I would call you, if you wanted me, and tell you if you'll send it, it can't be no damn making sick on it. I need — I need one electric cap and as much of a stick of damn dynamite as you can get. I'll take a damn radio and rig it into a bomb to where he plugs it up, that son of a bitch'll go off and it won' be damn coming back on that.
>
> . . . .
>
> GASKINS: That's about the best way that I can figure to get him. Because everything we get him just looks like it just makes him sick as hell and that's it. But one electric cap and as much of a stick you can get in as pure as you can get it, he told me to call you and maybe over the weekend you can find one stick somewhere and get it to me and damn if I can't fix him up.

Sometime after Tyner was killed, Gaskins sent State's witness J. B. Brown two letters in which he undertook to persuade Brown to go to a priest named Frankie San and confess that he (Brown) was responsible for Tyner's death. He asked Brown to tell the priest that he (Gaskins) had nothing to do with it. It was Gaskins' theory that the priest could then testify in court that someone other than Gaskins had admitted the murder while simultaneously, by reason of the priest privilege, he could not be required to reveal who admitted the killing. This would tend to exonerate Gaskins without implicating Brown in court. Brown refused to co-operate and the letters were introduced in court and considered by the jury.

The Supreme Court of the United States has refused to hold that harmless error vitiates the trial and requires a retrial. This killing is an execution-style slaying of the type referred to by Chief Justice Burger in *Connecticut v. Johnson*, 460 U. S. 73, 103 S. Ct. 969, 74 L. Ed. (2d) (1983). The jury

has found that Gaskins wrongfully killed Tyner. Under the facts of this case it would be folly to order a new trial for the purpose of determining whether the killing was done with malice or without malice.

Any debate on the malice issue at the guilt stage of the trial was conclusively resolved at the penalty stage when Gaskins said to the jury: "And I am guilty of participating in it. But I was not guilty in the final preparation of that. I was suppose to have received the bomb. I was to done it. But I was bypassed at the last minute on that."

We hold that the charge as to malice was harmless ■ error beyond a reasonable doubt.

## XIII.

The next question submitted to the Court, as taken from Gaskins' Brief, is as follows:

> The Trial Court should have excluded from evidence, in the sentencing portion of the trial, Appellant's 1978 confession, the details of the Appellant's prior murder convictions, as well as the photographs of the Appellant's prior murder victims.

The objection relates to the testimony of former Solicitor Kenneth Summerford. Summerford was the prosecuting attorney in the State Court in Florence. In 1978 he called Gaskins to trial for the murder of Johnny Knight wherein the death penalty was sought. During the proceedings, Solicitor Summerford, Gaskins and Gaskins' attorney entered into a plea bargain whereby Gaskins confessed to seven murders he had committed prior to 1978 in return for life sentences and no further prosecution as to others. Over a period of four days, Gaskins gave Summerford a 341-page detailed description and confession of the murders of Doreen Dempsey, her infant daughter Michelle Dempsey, John Henry Sellers, Jesse Judy, Avery Howard, Diane Neeley and Barnwell Yates. The confessions was made a part of the court record in the Florence court and served as a basis for Gaskins' seven guilty pleas to murder.

The State introduced into evidence the indictments and guilty pleas. Summerford was permitted to read to the jury excerpts from Gaskins' confessions in which he described the

various murders. In addition, photographs of victims were made exhibits.

The United States Supreme Court has held that "... █ consideration of the character and record of the individual offender and the circumstances of the particular offense [are] a constitutional indispensable part of the process of inflicting the penalty of death." *Woodson v. North Carolina*, 428 U. S. 280, 96 S. Ct. 2978, 49 L. Ed. (2d) 944 (1976). *Also see Barefoot v. Estelle*, 463 U. S. 880, 103 S. Ct. 3383, 77 L. Ed. (2d) 1090 (1983) and *State v. Plath*, 281 S. C. 1, 313 S. E. (2d) 619 (1984). We find no error in the judge's allowing this evidence to go to the jury in the sentencing phase.

Additionally, counsel for Gaskins argues that this █ evidence should not have been permitted because the State failed to provide him with the confessions and photographs used in aggravation prior to the commencement of the trial. Admittedly Gaskins was advised, as required by Code § 16-3-20(B), that the State would rely upon an aggravating circumstance among others as follows: "Murder was committed by the defendant who had a prior conviction for murder." In *State v. Plath*, 277 S. C. 126, 284 S. E. (2d) 221 (1981), we held that the solicitor need not provide in writing a list of all the evidence he intends to use in aggravation. The 341-page confession was given to Gaskins as soon as it was obtained from the Florence Court which was well into the middle of the trial. Prejudice can hardly be argued because Gaskins knew everything that was in the confession and knew about the photographs long before the trial began. There could be no surprise. There was no error in the failure of the State to give Gaskins a copy of the confession earlier.

In finding no error, we have taken into consideration the argument of counsel that Rule 103 and § 19-11-50 and § 19-1-80 of the Code have not been honored and applied. We hold that these two Code sections are simply inapplicable. Rule 103 allows the judge discretionary authority as follows:

> If at any time during the course of the proceedings it is brought to the attention of the court that a party has failed to comply with this rule, the court may order such party to permit the discovery or inspection, grant a

continuance, or prohibit the party from introducing evidence not disclosed, *or it may enter such other order as it deems just under the circumstances.* (Emphasis added.)

We also find no error in the admission of evidence of ▮ witnesses Fowler, Young and Henderson. Certainly, there was no prejudicial error and we so find beyond a reasonable doubt.

Counsel's argument that the statement given to the ▮ Court in Florence confessing the seven murders was not voluntary is not substantiated by the record.

We have considered the argument of counsel to the ▮ effect that the photographs should have been excluded because they were inflammatory and find the same without merit.

Counsel has referred to some of the proof as involving ▮ non-statutory aggravating circumstance. We think the designation erroneous. All of the evidence was properly admitted because it related to the aggravating circumstance of a previous murder conviction. It should be noted that the State does not rely on the aggravating murder evidence alone and submits that the other aggravating circumstance is sufficient for the finding that the death penalty is the appropriate sentence.

## XIV.

Gaskins contends that the trial judge erred in the sentencing phase by allowing former Solicitor Summerford to testify about the reversal of Gaskins' prior death sentence. He further argues error by the trial judge in allowing Summerford to testify about his thought processes in accepting a plea bargain from Gaskins in several earlier murder cases. Gaskins submits that his testimony caused the jury to believe that its responsibility in sentencing him was not final and thereby constituted an arbitrary factor inducing the jury to impose the death penalty. We disagree.

The trial judge properly exercised his discretion by ▮ permitting former Solicitor Summerford to testify that this court had reversed Gaskins' prior death sentence and why Summerford elected to accept Gaskins' guilty pleas for the other murders. This testimony was relevant to

the sentencing determination because it relates to Gaskins' record of prior criminal convictions for murder. Testimony concerning such prior criminal convictions is admissible as additional evidence during the sentencing phase of a capital case. *State v. Plath*, 281 S. C. 1, 313 S. E. (2d) 619 (1984). *See Woodson v. North Carolina, supra.*

The reversal of Gaskins' prior death sentence is a matter of public record. Summerford's testimony merely apprised the jury of Gaskins' prior record and the outcome of those prosecutions. Nothing in his testimony can be construed as an attempt to minimize the jury's responsibility in imposing a sentence. Also, nothing in his testimony indicated Summerford's personal opinion about the decision to seek the death penalty in the present case. We find the testimony was properly admitted.

## XV.

Gaskins submits that the trial judge erred in allowing into evidence racial prejudice as a characteristic of Gaskins. Gaskins is a white man; the deceased, Tyner, was a black man. The jury was composed of a mixture of both black and white citizens.

In the confessions referred to hereinabove given by Gaskins to Kenneth Summerford, the former solicitor who handled the several guilty pleas of murder, Gaskins referred to the father of one of the murdered children as being a "light-skinned nigger". On another occasion in the statement, Gaskins offered a reason for killing Doreen Dempsey: "She thought more of a nigger than a white man."

Selection of the jury consumed about four weeks. Each juror was questioned at length during *voir dire* and expressed his or her neutrality on the issue of racial prejudice. The trial judge has considerable latitude in the manner in which he selects an unbiased jury. He made great effort to assure that the jury which was chosen could give Gaskins a fair trial regardless of the fact that he was a white man accused of murdering a black man. No prejudice has been shown and we find the exception without merit.

## XVI.

The trial judge is charged with improperly denying Gaskins' motion for a mistrial because during the sentencing phase, he refused to exclude evidence of other crimes which had not resulted in convictions. Former Solicitor Summerford testified about confessions which Gaskins gave him. Included in the confessions of the several murders was a statement by Gaskins that he had stolen a boat, motor, and trailer. Also included in the confessions was a statement by Gaskins relative to the location of his niece's burial. Counsel for Gaskins argues that these portions of Summerford's testimony called to the jury's attention crimes for which Gaskins had not, in fact, been convicted. An appropriate curative instruction was given relative to the burial of Gaskins' niece. "When the record shows that objectionable evidence was either disallowed or struck out by motion and the jury instructed to disregard it, the appellant cannot complain." *State v. Stroman*, 281 S. C. 508, 316 S. E. (2d) 395 (1984).

Inasmuch as it was appropriate to tell the jury that ██ Gaskins had admitted maliciously killing seven people and had been convicted of maliciously killing an eighth, it is difficult to rationalize that there was prejudice in his own comment relative to either the theft or the burial of his niece. If this be error, which it was not, we find it to be harmless beyond a reasonable doubt.

## XVII.

Gaskins argues that allowing evidence of guilt of prior ██ murders in the sentencing phase of the trial was error because "the use of prior convictions for murder in the sentencing portion of a trial as a factor in aggravation is a violation of the double jeopardy clause of the Sixth Amendment of the Constitution of the United States" and "in violation of the Eighth and Fourteenth Amendments in that the jury's attention was not focused on the particularized matter of the crime and the particularized characteristics of the defendant." The exception is patently without merit. A defendant's record of previous criminal convictions has always been deemed relevant in the imposition of sentences. Gaskins is not being tried twice nor punished twice for the same

crime. If one has heretofore not been guilty of a crime, it is appropriate that the judge take this into consideration. In like fashion, if one has been guilty of crimes heretofore, the sentencing authority may and should consider it. We find no error.

## XVIII.

At the sentencing phase of the trial, Gaskins' counsel offered in evidence a confession given by Tyner to the effect that he killed Mr. and Mrs. Moon. The confession was not allowed. It is submitted that this confession should have been admitted as a mitigating circumstance. Apparently the gist of the argument is that if he could show that Tyner should have died because of his treatment of the Moons, it would justify to some degree Gaskins' execution of him. Obviously, the jurors knew that the State of South Carolina had determined that Tyner should be executed. Nothing Gaskins could prove would more conclusively show that Tyner was culpable. Be that as it may, Tyner was entitled to live until the State of South Carolina carried out the order of execution. The fact that the State had conclusively found that Tyner should be executed did not entitle Gaskins to kill him. We find no error in excluding Tyner's confession.

## XIX.

Gaskins' final exception relates to the judge's charge to the jury in the sentencing phase. He submits that the judge instructed the jury that a reasonable doubt standard was applicable to mitigating circumstances. We have read the charge and considered it as a whole. We find no error. The trial judge's charge must be viewed as a whole with the words considered in their context. *State v. Thompson*, 278 S. C. 1, 292 S. E. (2d) 581 (1982).

The purpose of a charge is to enlighten the jury. Assignment of error may not be predicated upon isolated excerpts which, standing alone, might be misleading. The judge talked at length to the jury about aggravating and mitigating circumstances. He made it patently clear: (1) that if aggravating circumstances were not proved, a death penalty could not be recommended; (2) that a

death penalty could not be recommended unless at least one aggravating circumstance was proved; (3) that if statutory or non-statutory mitigating circumstances were found, a life sentence would be appropriate; (4) that the jury had full discretion, even though aggravating circumstances be found and no mitigating circumstances be proved to impose a life sentence rather than death. The jury found two aggravating circumstances; it found no mitigating circumstances; it recommended a death sentence.

From a reading of the whole charge, we find that the jury could not have been mislead about its duties and the applicable law. We find no error.

## XX.

Pursuant to Section 16-3-25(C), *Code of Laws of South Carolina* (Cum. Supp. 1978), it is the duty of this Court to review the record and determine with regard to the sentence imposed:

(1) Whether the sentence of death was imposed under the influence of passion, prejudice, or any arbitrary factor, and
(2) Whether the evidence supports the jury's or judge's finding of a statutory aggravating circumstance as enumerated in § 16-3-20, and
(3) Whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant.

Upon a review of the record, we concur with the ruling of the trial judge when he said: "I find as an affirmative fact that the evidence of the case warrants the imposition of the death penalty and that its imposition is not a result of prejudice, passion, or any other arbitrary factor."

We further find that the evidence overwhelmingly supports the jury's findings beyond a reasonable doubt that the statutory aggravating circumstances of "Murder was committed by a person with a prior record of conviction of murder" and "The offender caused or directed another to commit murder or committed murder as an agent or employee of another person" as enumerated in S. C. Code Ann. Section 16-3-20 (Cumm. Supp. 1978) were proved.

The evidence quoted hereinabove describes the gruesome plans and details by means of which Gaskins brought about the death of Tyner and need not be repeated here. Gaskins is obviously a mature person of considerable ability and cunning. His conversations on the telephone and his carrying out of the murder plan as well as his efforts after Tyner's death to lure the State's witness into helping to exonerate him involves a scheme which is about as wicked as is conceivable.

We find that the penalty imposed is not disproportionate to the penalty imposed in other cases under the comparatively new death penalty statute. The jury had ample opportunity to weigh all of the evidence that might relate to mitigating circumstances and found none offsetting the two aggravating circumstances. We agree.

We have further examined and researched past death penalty cases in this State tried under the current statute in an attempt to determine whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crimes and the defendants. *South Carolina Code Ann.* Section 16-3-25(C)(3).

Cases tried in this State under the death penalty statute resulting in capital punishment heretofore, involved factual situations, and accused persons, similarly atrocious to those involved in this case. It is our observation that an unanimous jury in South Carolina has ordered the death penalty in only those cases where the proof of facts is virtually undebatable and the nature of the wrongful killing is such as to shake the conscience of the community. The facts are not the same in any two cases and, accordingly, our review of the facts relate largely to degree of culpability of the defendants and the viciousness of the killing. In the case at hand, there is no semblance of an excuse for the wrongful killing, nor does the record reveal any facts relative to the accused persons themselves that would warrant leniency. Our comparison includes: *State v. Yates,* 280 S. C. 29, 310 S. E. (2d) 805 (1982); *State v. Gilbert,* 277 S. C. 53, 283 S. E. (2d) 179, *cert. den.* 456 U. S. 984, 102 S. Ct. 2258, 72 L. Ed. (2d) 863 (1982); *State v. Shaw,* 273 S. C. 194, 255 S. E. (2d) 799, *cert. den.,* 444 U. S. 957, 100 S. Ct. 437, 62 L. Ed. (2d) 329 (1979); *Roach v. South Carolina,* 444 U. S. 1026, 100 S. Ct. 690, 62 L. Ed. (2d) 660 (1980); *State v. Woomer,* 276 S. C. 258, 277 S. E. (2d) 696 (1981), 278

S. C. 468, 299 S. E. (2d) 317 (1982); and *State v. Thompson,* 278 S. C. 1, 292 S. E. (2d) 581, *cert. den.,* 457 U. S. 1112, 102 S. Ct. 2917, 73 L Ed. (2d) 1323 (1982); *State v. Plath, et al.,* 281 S. C. 1, 313 S. E. (2d) 619 (1984); *State v. Koon,* 278 S. C. 528, 298 S. E. (2d) 769 (1982), and Opinion Number 22075, Davis' Advance Sheet No. 19, filed April 3, 1984; *State v. Patterson,* Opinion Number 22168, Davis' Advance Sheet No. 50, filed October 10, 1984; *State v. Truesdale, supra; State v. Chaffee and Ferrell,* Opinion Number 22182, Davis' Advance Sheet No. 54, filed November 13, 1984.

In addition to considering all issues raised by counsel, we have examined the entire record because of the doctrine of *in favorem vitae* to ascertain if there are reasons to upset the jury's verdict notwithstanding any failure of counsel to raise other issues. We have found no reversible error. The conviction and sentence of the Appellant Donald Henry Gaskins is accordingly

Affirmed.