Donald Henry GASKINS,
Petitioner–Appellant,

v.

Kenneth D. McKELLAR, Warden, Central Correctional Institution; Attorney General of South Carolina, T. Travis Medlock, Respondents–Appellees.

No. 89–4011.

United States Court of Appeals,
Fourth Circuit.

Argued March 7, 1990.

Decided Oct. 15, 1990.

Rehearing and Rehearing In Banc
Denied Nov. 16, 1990.

John Henry Blume, III (argued), South Carolina Death Penalty Resource Center, Columbia, S.C., for petitioner-appellant.

Frank Louis Valenta, Jr., Asst. Atty. Gen., Donald J. Zelenka, Chief Deputy Atty. Gen., T. Travis Medlock, Atty. Gen. (on brief), Columbia, S.C., for respondents-appellees.

Before ERVIN, Chief Judge, and PHILLIPS and CHAPMAN, Circuit Judges.

PHILLIPS, Circuit Judge:

Donald Henry Gaskins, a South Carolina prison inmate under sentence of death for capital murder, appeals the district court's denial of an evidentiary hearing and dismissal of his 28 U.S.C. § 2254 petition for failure to show entitlement to federal collateral relief. We affirm.

I

Gaskins' victim, fellow death row inmate Rudolph Tyner, had been sentenced to death for killing a Mr. and Mrs. Moon during a robbery. Tony Cimo, a stepson of the Moons, seeking to avenge the murders, contacted an acquaintance who put him in touch with Gaskins, who was serving ten life sentences, nine for murder and one for burglary. Telephone toll records produced at trial showed that thereafter Gaskins made a number of collect calls either to Cimo or to Cimo's acquaintance who had made the contact. Some of the recorded calls revealed that, after numerous failed attempts to poison Tyner, Gaskins resolved to kill Tyner by means of an explosive device.

Ultimately, Gaskins succeeded. James Arthur Brown, a prisoner assigned to deliver meals to death-row inmates, testified that on the afternoon of the murder, Gaskins asked Brown to deliver a device to Tyner. Brown described the device as a radio-type speaker built into a plastic cup through which, Gaskins led Brown to be-

lieve, Tyner could communicate with Gaskins in the adjoining cell rather than having to yell through a common vent. The bottom of the cup had a female-electrical socket adapted for connection to an extension cord. Along with the cup's delivery Brown was to tell Tyner that "'the wire was in the bottom vent in his cell.'" *See State v. Gaskins*, 284 S.C. 105, 326 S.E.2d 132, 136 (1985). Presumably, Tyner then found the wire in the common vent and plugged it into the cup-speaker. The cup exploded, blowing off part of Tyner's head and killing him. Brown testified that after the explosion he went to Gaskins' cell and saw Gaskins pulling a wire from the common vent in his own cell.

Gaskins was convicted and sentenced to death by a jury, and his conviction and sentence were affirmed on direct appeal. *See State v. Gaskins*, 284 S.C. 105, 326 S.E.2d 132 (1985), *cert. denied*, 471 U.S. 1120, 105 S.Ct. 2368, 86 L.Ed.2d 266 (1985). Efforts to obtain state post-conviction relief were unavailing. *See Gaskins v. State*, No. 85–CP–40–3466, Letter Order (S.C. Jan. 7, 1987), *cert. denied*, 482 U.S. 909, 107 S.Ct. 2491, 96 L.Ed.2d 382 (1987).

This § 2254 petition, raising several claims, followed and was summarily dismissed by the district court. A number of issues and sub-issues are raised on appeal. Of these, one involves the denial of an evidentiary hearing respecting the admission in evidence at sentencing of an earlier confession to other murders, one involves a claimed denial of due process by virtue of trial judge bias, two involve alleged constitutional violations in jury selection, three involve trial court evidentiary rulings allegedly impacting on the trial's fundamental fairness, one involves prosecutorial misconduct, two involve guilt-phase jury instructions, and five involve alleged errors during the trial's sentencing phase.

We address each of these in turn.

## II

Gaskins contends that he was erroneously denied an evidentiary hearing to establish his claim that portions of a confession given by him in connection with an earlier, bargained plea of guilty to several unrelated murders were unconstitutionally admitted at the sentencing phase of his Tyner murder trial.

The district court summarily dismissed this invalid-use-of-confession claim on the stated basis that "[t]here is no reason, and no precedent, for arguing the confession's invalidity for the first time during the sentencing phase of a trial for a subsequent crime five years later ... [rather than] in a collateral proceeding directed at those prior crimes." On this appeal, the parties have joined issue on this threshold question of the habeas court's power to entertain this claim. Because it is a difficult issue with broad and unclear implications,[1] and because there is an alternative basis for upholding the summary dismissal, we decline to rest decision upon the district court's stated basis for dismissing the claim.

To address the alternative basis, it is necessary first to identify the exact nature of Gaskins' constitutional claim. We take it to be that because the earlier confession was coerced, hence involuntarily given, hence unconstitutionally obtained, its use in evidence in the sentencing phase of the later Tyner trial violated Gaskins' eighth amendment right to a "reliab[le] ... determination that death is the appropriate punishment." *Johnson v. Mississippi*, 486 U.S. 578, 584, 108 S.Ct. 1981, 1986, 100 L.Ed.2d 575 (1988) (death penalty predicated in part on prior conviction vacated because coerced confession violates eighth amendment) (quoting *Gardner v. Florida*, 430 U.S. 349, 363–64, 97 S.Ct. 1197, 1207–08, 51 L.Ed.2d 393 (1977)).

The claim is rested on the undisputed fact that at Gaskins' sentencing hearing, a state solicitor was allowed, over Gaskins' timely objection, to read portions of the

---

1. *Cf. United States v. Jones*, 907 F.2d 456, 460–69 (4th Cir.1990), and *id.* at 470–84 (dissenting opinion) (conflicting views on constitutional power of federal sentencing court to entertain collateral challenge to validity of prior state court conviction invoked for sentence enhancement purposes).

earlier confession in which Gaskins had admitted committing seven other murders. Though in personally arguing his case to the sentencing jury Gaskins specifically conceded that, "I'm guilty of some of [the murders], yes. I do not deny that," J.A. at 593, his contention apparently now is that he was coerced into confessing to more than he later conceded to the sentencing jury. From this, the argument runs that the sentencing jury's determination could be shown to be constitutionally unreliable if, as he claimed but was not allowed to establish by evidence, the jury thought him guilty of all the seven murders rather than the "some" lesser number that he specifically conceded. Given this possibility, Gaskins contends that the district court erred in failing to give him an evidentiary hearing to attempt to establish his claim of constitutional unreliability.

■ This argument fails because of the claim's facial lack of merit. Where the allegations in a habeas petition are palpably incredible, the petition properly may be dismissed without affording any evidentiary hearing. *See Blackledge v. Allison*, 431 U.S. 63, 75–76, 97 S.Ct. 1621, 1629–30, 52 L.Ed.2d 136 (1977). Here the ultimate allegation, on which habeas relief depended, was that the sentencing jury's misperception of the exact number of unrelated murders that Gaskins had committed made its imposition of the death penalty constitutionally unreliable. Under the circumstances, the district court properly could have viewed this as an allegation incredible on its face, and on that basis summarily dismissed the claim. Even assuming the truth of the predicate allegation—that the earlier confession had admitted more murders than Gaskins actually had committed—it defies belief that a jury to which he had just renewed his confession to at least an indefinite "some" of the *seven* earlier confessed would have acted differently

(more reliably) had it been aware of the exact mathematical disparity between those actually committed and those confessed.

■ We might also affirm the summary dismissal of this claim on the alternative basis of a roughly parallel harmless error analysis. *See Estelle v. Smith*, 451 U.S. 454, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1981) (harmless error analysis appropriate in review of capital sentencing proceeding). Here the record shows that the state sentencing jury found two aggravating factors: prior murder convictions and murder for hire. It also reveals that the jury had before it, in addition to the earlier confessed murders, still another prior conviction of murder by jury verdict. Both this latter conviction and the murder-for-hire finding stand unchallenged.[2] As earlier indicated, the most favorable result that could be achieved by an evidentiary hearing to challenge the sentencing jury's finding of prior murders as an aggravator would be a demonstration that the jury erroneously believed that Gaskins had committed seven confessed murders, when he had only committed "some" number less than that. When it is recalled that the jury also had before it still another unchallenged murder conviction by jury trial, it is obvious that any error in denying an evidentiary hearing with such a limited potential was harmless beyond a reasonable doubt. *See Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967).

### III

■ We next consider the district court's dismissal of Gaskins' claim that the state trial judge's demonstrated bias and lack of impartiality made his state trial fundamentally unfair and therefore violated his constitutional right to due process.

**2.** The parties do not raise and we therefore do not address the possible bearing on this point of *Zant v. Stephens*, 462 U.S. 862, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983) (where capital sentencing jurors have found two aggravators, invalidation of one on review does not require vacating death sentence), and *Smith v. Procunier*, 769

F.2d 170 (4th Cir.1985), *aff'd on other grounds*, 477 U.S. 527, 106 S.Ct. 2661, 91 L.Ed.2d 434 (1986) (constitutional invalidity of one finding of aggravating factor does not require vacating death penalty where another aggravator is unchallenged).

Fourteenth amendment due process requires, at a minimum, an impartial judge and jury. *See Anderson v. Warden, Md. Penitentiary*, 696 F.2d 296, 299 (4th Cir. 1982). Gaskins makes a number of arguments supporting his contention that the state trial judge demonstrably was lacking in the requisite degree of impartiality to ensure due process. First, he points to twenty-two instances where the state trial judge allegedly improperly questioned witnesses. Second, he points to a newspaper article published after the guilt phase of Gaskins' trial, but before sentencing, in which the trial judge, in response to a reporter's question whether the judge thought Gaskins would receive the death penalty, replied, "what can you give a man who has got ten life sentences."

We are persuaded upon a careful review of the record that the judge's conduct did not deny Gaskins a constitutionally fair trial.

Of the twenty-two alleged instances where the trial judge questioned witnesses, Gaskins asserts the following as examples of the most "egregious" demonstrations of impermissible bias. These occurred during the questioning of state's witness James Brown and Gaskins' chief rebuttal witness to Brown's testimony, John Caison.

It will be recalled that Brown was the inmate who, allegedly at Gaskins' behest, actually delivered the bomb to Tyner, and who testified to that effect at trial. The allegedly prejudicial conduct occurred when the state attempted to introduce through Brown certain incriminating letters that Gaskins had given Brown. After Brown testified that Gaskins had given him the letters, but before the letters were introduced, the trial judge conducted a hearing outside the hearing of the jury to determine the letters' admissibility. When the jury returned, the trial judge, even though Brown had already testified to the source of the letters, asked Brown to "reiterate where he got the documents from for the jury." J.A. at 214.

During Brown's cross-examination, Gaskins attempted to establish that the letters were not incriminating. After sustaining an objection to a question concerning the intent of a phrase in the letter, the trial judge asked Brown directly what the letters meant to him. When Brown responded that they meant that Gaskins was trying to talk Brown into "taking the rap for it," the trial judge commented, "[t]hat's right. That's what he thought." J.A. at 269.

During the state's cross-examination of Gaskins' rebuttal witness, John Caison, Caison testified that Brown told Caison that Brown and others were plotting to get Tyner. When Caison testified that Brown did not reveal other members of the plot, the following colloquy occurred between the trial judge and Caison:

THE COURT: You didn't ask [Brown who the other members of the plot were?]

CAISON: No, he said . . .

THE COURT: It's such a big event, weren't you curious?

CAISON: What he told me, he said . . .

THE COURT: Tell the truth now. Did you ask him?

CAISON: I asked him what it was about.

THE COURT: Did he tell you?

CAISON: No sir, he . . .

THE COURT: He wouldn't tell you?

CAISON: He told me the less that I knew the better off I was.

THE COURT: He delivered the explosives for somebody else?

CAISON: I guess so. He didn't tell me that.

THE COURT: He didn't tell you that. Tell the jury what he told you?

J.A. at 336–37.

Later, after Caison's redirect testimony concerning Brown's alleged involvement in an earlier attempt to poison Tyner, the trial judge again engaged in a colloquy with Caison:

MR. SWERLING: Who told you not to go on Death Row [the day Tyner was killed]?

CAISON: James Brown.

\* \* \* \* \* \*

THE COURT: Why did he tell you that?

CAISON: He didn't want me to go on there to know about nothing. He wanted me to stay away from death row.
THE COURT: All right. What did he have against Rudolph Tyner? Why did he want to kill him?
CAISON: For the money.

\* \* \* \* \* \*

THE COURT: [Where did the money come from?]

\* \* \* \* \* \*

CAISON: I don't know. He didn't say.
THE COURT: And you didn't ask?
CAISON: He wouldn't have told me anyhow.

\* \* \* \* \* \*

THE COURT: Why didn't you ask him who paid him money?

\* \* \* \* \* \*

CAISON: Well, when somebody don't want to answer your question, you best leave them alone.

J.A. 343–47.

Gaskins argues that the trial judge's engagement with Brown and Caison reflected to the jury that Brown's theory, and not Caison's theory, was credible. This, argues Gaskins, rendered the trial fundamentally unfair, especially when coupled with the following accessory-before-the-fact jury instruction:

[Y]ou must be convinced as I told you that the Defendant here aided, counseled, or otherwise procured James Brown to commit the murder of Rudolph Tyner and that the Defendant was not present either actually or constructively.

J.A. 446. The instruction, argues Gaskins, simply incorporated the state's theory of the offense into the charge.

Although these various instances of involvement by the trial judge might, in isolation, have damaged Gaskins' ability to discredit Brown's testimony, taken in the context of the entire trial, the trial judge's involvement did not render the trial fundamentally unfair. The record evidence of Gaskins' involvement in the plot to kill Tyner, even without Brown's testimony, was overwhelming. We therefore hold that any

error in the trial court's involvement was harmless beyond a reasonable doubt. *See Anderson,* 696 F.2d at 299. Moreover, we fail to understand how the disputed jury instruction was in any way erroneous and we are directed to no case law to that effect. On the evidence of record, this was a proper instruction concerning what the jury had to find before it could convict Gaskins of murder or accessory before the fact to murder.

■ Finally, respecting the trial judge's alleged statement to the newspaper, although we seriously question the propriety of such a statement if actually made, there is no evidence that the newspaper was read by any members of the sequestered jury or that by making the statement the trial judge allowed arbitrary factors to enter into the jury's deliberation. The judge himself did not of course decide the sentence to be imposed.

We therefore affirm the district court's rejection of the claim of a denial of due process by virtue of the trial judge's lack of impartiality.

## IV

■ We next consider related claims respecting the jury selection process.

Of ten peremptory challenges available to Gaskins, three were exercised to exclude jurors Rhyne, Richardson, and Cecil. Gaskins argues that, for various reasons, the trial court erroneously refused to excuse these jurors for cause. Of the jurors who did sit, Gaskins argues that the trial court erroneously refused to excuse juror Doster for cause.

Gaskins rightly makes no claim that requiring him to use peremptory challenges to exclude jurors Rhyne, Richardson, and Cecil violated his fourteenth amendment right to due process by arbitrarily depriving him of the full complement of peremptory challenges allowed by South Carolina law. *See Ross v. Oklahoma,* 487 U.S. 81, 108 S.Ct. 2273, 101 L.Ed.2d 80 (1988). The crux of Gaskins' claim in this regard is that he was denied his sixth amendment right to an impartial jury.

"Any claim that the jury was not impartial ... must focus ... on the jurors who actually sat" and cannot be established simply by showing the loss of a peremptory challenge. *Id.* at 86, 108 S.Ct. at 2277. Accordingly, we examine Gaskins' claim in light of the jurors who actually sat.

Of the jurors who actually sat, Gaskins only challenges the impartiality of juror Doster, whom Gaskins unsuccessfully challenged for cause but did not then challenge peremptorily. Doster admitted on *voir dire* that his "honest opinion is that [Gaskins] was found guilty, convicted of those earlier murders, [and] he should have been executed at that time." J.A. 110. Moreover, upon questioning by the trial court, Doster stated that, if Gaskins were found guilty of Tyner's murder, and that if it were shown that Gaskins had murdered before, Doster would be predisposed to impose a death penalty. Though he concedes that Doster was capable of impartially determining guilt or innocence, Gaskins contends that Doster should have been excused for cause because Doster's ability to consider a life sentence would be substantially impaired by his belief that Gaskins should have received the death penalty for the previous murders.

While it may be true that Doster was predisposed in favor of the death penalty, we find no constitutional error in the trial court's refusal to exclude him. First, it is important to note that Gaskins elected not to use an available peremptory challenge to remove Doster. Though not dispositive, this is some indication that, at the time, the trial judge and Gaskins, both of whom had opportunity to observe Doster's demeanor, felt that Doster would act impartially. The controlling principle here is that "the most that can be demanded of a venireman ... is that he be willing to *consider* all of the penalties provided by state law, and that he not be irrevocably committed." *Witherspoon v. Illinois*, 391 U.S. 510, 522 n. 21, 88 S.Ct. 1770, 1777 n. 21, 20 L.Ed.2d 776 (1968) (emphasis in original). Our examination of Doster's *voir dire* testimony convinces us that the district judge did not err in concluding that he was not irrevocably committed. At numerous times during questioning, Doster stated that he could give a life sentence, even in the presence of aggravating circumstances. Doster stated that, though he could not with certainty say that the prior conviction would not affect his thoughts on sentencing, when it came time actually to impose the death sentence, he did not know how he would vote. Under the circumstances, we cannot say that Doster's views would "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." *Adams v. Texas*, 448 U.S. 38, 45, 100 S.Ct. 2521, 2526, 65 L.Ed.2d 581 (1980).

Accordingly, we agree with the district court that the trial court's refusal to dismiss Doster for cause did not violate Gaskins' sixth amendment right to an impartial jury.

V

During the course of the trial, the trial court made three evidentiary rulings which, Gaskins argues, rendered his trial fundamentally unfair. The first involved Gaskins' cross-examination of James Brown; the second involved Gaskins' direct examination of John Caison; the third involved allowing a material witness to assert the fifth amendment.

During cross-examination of Brown, Gaskins sought to discredit Brown with questions concerning Brown's attempts to blame on others the two prior murders of which he had been convicted. This evidence, argues Gaskins, constituted not only an attack on Brown's credibility, but would also have buttressed Gaskins' theory that Brown, not Gaskins, had conceived and executed Tyner's murder. The trial court excluded this evidence based upon the general South Carolina rule that only the fact of a conviction of a crime of moral turpitude is admissible. On appeal, the South Carolina Supreme Court held that, to the extent the trial court's ruling was erroneous, such error was harmless. *See Gaskins*, 326 S.E.2d at 139-40. We agree.

Absent "circumstances impugning fundamental fairness or infringing spe-

cific constitutional protections," admissibility of evidence does not present a federal question. *Grundler v. North Carolina*, 283 F.2d 798, 802 (4th Cir.1960). Nevertheless, the defendant has a fundamental right to effective cross-examination on matters bearing on the witness' credibility. *See Davis v. Alaska*, 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974). We agree with the district court that the trial judge's discretionary refusal to allow this particular line of cross-examination did not deny any federal constitutional right, if indeed it constituted an abuse of discretion under state law.

Although Gaskins was not permitted to elicit from Brown the circumstances surrounding his other convictions, Gaskins availed himself of ample opportunities to discredit Brown's testimony. For example, during cross-examination, Brown revealed that, contrary to his trial testimony, he had initially told investigators that he and Gaskins had run together to Tyner's cell after the explosion. J.A. at 225. On further cross-examination, Brown admitted that he had revealed nothing to investigators about the speaker-cup bomb, and that when he finally did give his present version of the Tyner murder to the prosecutor, he did so from fear of being charged himself. J.A. at 232. In light of ample opportunities to impeach Brown's credibility, and in light of the overwhelming evidence of Gaskins' guilt, any abuse of the trial court's discretion on this score was harmless beyond a reasonable doubt.

■ Similarly, any improper restriction on Gaskins' direct examination of John Caison was harmless beyond a reasonable doubt. On direct examination, James Brown stated that he had never admitted to Caison having attempted to poison Tyner. On direct examination of Caison, Gaskins attempted to elicit testimony to the effect that Brown had admitted attempting to poison Tyner and that, on the day of the explosion, Brown had told Caison to stay away from death row. The trial court excluded these statements as inadmissible hearsay. J.A. at 298–301. Even so, during cross-examination, Caison testified that

"James Brown told me that they were plotting to get [Tyner]," and that Brown told Caison "not to be on death row on Sunday." J.A. at 336–37. The information allegedly excluded was therefore ultimately adduced during cross-examination, rendering any error by the trial court in excluding it harmless beyond reasonable doubt. *See Grundler*, 283 F.2d at 802.

Gaskins' final challenge to the state trial court's evidentiary rulings involves the court's refusal, after being informed that witness William Cole would assert his fifth amendment privilege against self-incrimination if forced to testify, to require Cole to take the stand and assert the privilege in open court. Out of the jury's hearing, the trial court determined that the crux of Cole's testimony would be that, after the explosion, Gaskins went, not to his cell as Brown had testified, but down to the site of the explosion. *See Gaskins*, 326 S.E.2d at 140.

■ A criminal defendant's right to compel testimony is fundamental to sixth and fourteenth amendment due process rights. *See United States v. Goodwin*, 625 F.2d 693, 703–04 (5th Cir.1980). When a witness indicates that he will assert the fifth amendment privilege, the trial judge must make a proper and particularized inquiry into the legitimacy and scope of the witness' assertion of the privilege. *See id.* at 701. A witness may be totally excused only if the court finds that he could legitimately refuse to answer any and all relevant questions. *See id.*

■ On this point we agree with the South Carolina Supreme Court that the trial court's refusal to require Cole to assert his fifth amendment privilege before the jury was in any event harmless error. First off, as the South Carolina Supreme Court concluded, Cole's testimony would have been merely cumulative. *See Gaskins*, 326 S.E.2d at 140. Moreover, the fact that Gaskins did not elect to offer Cole's expected testimony in the state post-conviction proceeding strongly suggests his own estimate of its slight probative value. Any error in refusing to require Cole to take the

stand was harmless beyond a reasonable doubt.

## VI

Gaskins' next claim involves alleged prosecutorial misconduct.

During the state's closing argument at the guilt phase of Gaskins' trial, the solicitor stated that he wished to talk to the jury "about what is not in dispute in this case." J.A. at 367. The solicitor then proceeded to list fourteen so-called "undisputed" pieces of evidence, eight of which, Gaskins argues, only Gaskins could have disputed. Additionally, during the sentencing phase of Gaskins' trial, the prosecutor stated that "Mr. Gaskins has shown no remorse. No emotion. He has shown you nothing." J.A. at 577. Gaskins did not object to these statements at trial, but argued on both direct appeal and collateral review that these statements constituted violations of *Doyle v. Ohio*, 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976) (improper comment on defendant's failure to testify).

In assessing an alleged *Doyle* violation, the question is whether the disputed statement so infected the trial and sentencing with unfairness that the ultimate conviction and sentence constituted a denial of due process. *See Darden v. Wainwright*, 477 U.S. 168, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986). The eight "undisputed" pieces of evidence are: (1) tapes of Gaskins' conversations with Jack Martin (the intermediary through whom Cimo contacted Gaskins in prison); (2) identities of the voices on the Martin–Gaskins tapes; (3) the dates when the conversations occurred; (4) the exhibit showing when Cimo and Gaskins conversed; (5) Gaskins' voice on a statement given to an investigator; (6) two inculpatory letters written from Gaskins to Brown; (7) a letter written from Gaskins to Lee exculpating Lee; and (8) that electronic equipment, a soldering iron, speakers, and radios were found in Gaskins' cell.

As the magistrate's recommendation, adopted by the district court, correctly notes, Gaskins presumably could have sought the testimony of voice and handwriting analysts to contradict items 1–7,

and any number of inmates could have testified to the items Gaskins kept in his cell before Tyner's murder. We agree with the district court that, under these circumstances, the prosecutor's "laundry list" argument did not constitute a *Doyle* violation.

Likewise, the state's argument during sentencing to the effect that Gaskins has shown no remorse must be viewed in context. The solicitor stated that:

> Mr. Gaskins has announced to the Court that he is going to make a speech to you as well. I want Mr. Gaskins when he comes up to tell you what in his character caused him to murder each of these people, what caused him to murder Dennis Bellamy? What caused him to shoot this 15 year old, Johnny Knight, in the back of the head?
>
> \*     \*     \*     \*     \*     \*
>
> Mr. Gaskins has shown no remorse. No emotion. He has shown you nothing.
>
> \*     \*     \*     \*     \*     \*
>
> Mr. [Gaskins] is going to speak to you at this time ... and I ask you to listen to [him] as you listened to me.

J.A. 576–77. Under no reasonable view can the solicitor's statement be construed to constitute an improper comment on Gaskins' refusal to testify at the guilt phase of his trial.

## VII

Gaskins asserts the following two errors in the trial court's guilt-phase jury instructions: (1) the trial court's charge regarding presumed malice constituted an impermissible burden-shifting instruction; and (2) the trial court's reasonable doubt instruction impermissibly lessened the state's burden of proof.

As part of the jury charge, the trial court instructed the jury that "while malice is presumed from the use of a deadly weapon or from a dangerous instrument ... where circumstances relating and surrounding the incident are brought out, then the presumption vanishes and malice again must be proven to you beyond a reasonable doubt."

J.A. at 442. On direct appeal, the South Carolina Supreme Court held that, although the instruction constituted impermissible burden-shifting, the constitutional error was harmless beyond a reasonable doubt. *See Gaskins*, 326 S.E.2d at 143. Both the magistrate and the district court agreed with the state supreme court. J.A. 1186; 1326–27. We also agree.

■ Even where an instruction constitutes impermissible burden-shifting, any error in giving it may be found harmless if the reviewing court can say beyond reasonable doubt that the jury would have found it unnecessary to rely on the burden-shifting presumption in order to convict. *See Rose v. Clark*, 478 U.S. 570, 583, 106 S.Ct. 3101, 3109, 92 L.Ed.2d 460 (1986).

■ Here, the jury necessarily found by its guilty verdict that Gaskins had murdered Tyner with a bomb Gaskins had built from electronic components in his cell and a piece of dynamite he received in the mail, so it is difficult to see how the jury could not have concluded, even without the presumption, that the killing was done "with malice." Aside from the raw circumstances of the killing, transcripts of conversations between Gaskins and Jack Martin (the intermediary who procured Tyner's murder) constitute further overwhelming evidence of malice.[3] We therefore can say " 'beyond a reasonable doubt that the jury would have found it unnecessary to rely on the presumption.' " *Id.*

■ Gaskins next asserts that the trial court's definition of reasonable doubt for the jury as "*a doubt for which you can give a reason[,] [i]t is a substantial doubt*," J.A. at 439, relieved the prosecution of proving every element of the crime beyond reasonable doubt as required by *In re Winship*, 397 U.S. 358, 364, 90 S.Ct. 1068, 1072, 25 L.Ed.2d 368 (1970).

An instruction equating reasonable doubt with " 'a substantial doubt, a real doubt' ... although perhaps not in itself reversible error, often has been criticized as confusing." *Taylor v. Kentucky*, 436 U.S. 478, 488, 98 S.Ct. 1930, 1936, 56 L.Ed.2d 468 (1978). At some point, a reasonable doubt definition may be so incomprehensible or potentially prejudicial that it requires reversal. *See United States v. Moss*, 756 F.2d 329, 333 (4th Cir.1985). Nevertheless, the question in a collateral proceeding such as this is "whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process, not merely whether 'the instruction is undesirable, erroneous or even universally condemned.' " *Smith v. Bordenkircher*, 718 F.2d 1273, 1276 (4th Cir.1983) (quoting *Henderson v. Kibbe*, 431 U.S. 145, 154, 97 S.Ct. 1730, 1736, 52 L.Ed.2d 203 (1977) (citations omitted)).

Viewed in the context of the entire record of trial, the substantial-doubt portion of the instruction did not rise to the level of a due process violation. First, the trial court employed the instruction to set in contrast "some imaginary doubt or some slight doubt or some fanciful doubt that you might have." J.A. at 439. The trial judge's use of the term substantial doubt was, in context of the entire instruction, more accurate than when viewed in artificial isolation, and was not "likely to 'mislead the jury into finding no reasonable doubt when in fact there was some.' " *Smith v. Bordenkircher*, 718 F.2d at 1277. Moreover, the trial court flatly instructed the jury that "the proof offered by the state must exclude every other reasonable hypothesis except the guilt of the accused and must satisfy you beyond a reasonable doubt." J.A. at 444. This instruction further neutralized any negative effects of the substantial-doubt instruction. *See Bordenkircher*, 718 F.2d at 1277.

---

**3.** Some examples of conversations appear in the record:

When he plugs that son of a bitch up, it'll blow him on into hell.... Dam [sic] if I can't fix him up.

Get me enough to do that damn job and listen for the bang.

That's enough [drug] to bust his heart. The next night after I get [the poison] ... that son of a bitch'll be laid out.

That's a hell of a hard nigger to get rid of. J.A. 1185.

We are not prepared to say that this instruction, even in combination with the substantial doubt instruction, "so infected the entire trial that the resulting conviction violates due process." *Id.* at 1276.

## VIII

■ Gaskins argues that allowing evidence that a prior death sentence of Gaskins had been vacated could have led the jury to believe that any death penalty it imposed was advisory only, thereby diminishing the jurors' sense of responsibility for death-penalty imposition in violation of *Caldwell v. Mississippi,* 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985) (eighth amendment violation to tell jury that Mississippi Supreme Court would review any death sentence).[4]

"[I]t is constitutionally impermissible to rest a death sentence on a determination made by a sentencer who has been led to believe that the responsibility for determining the appropriateness of the defendant's death rests elsewhere." *Caldwell,* 472 U.S. at 328–29, 105 S.Ct. at 2639–40. Nevertheless, "if the challenged instructions accurately described the role of the jury under state law, there is no basis for a *Caldwell* claim. To establish a *Caldwell* violation, a defendant necessarily must show that the remarks to the jury improperly described the role assigned to the jury by local law." *Dugger v. Adams,* 489 U.S. 401, 109 S.Ct. 1211, 1215, 103 L.Ed.2d 435 (1989).

The asserted *Caldwell* violation occurred when, during the penalty phase of the trial, the state introduced evidence of Gaskins' previously vacated murder conviction.[5] And it is argued that this *Caldwell* violation was aggravated by the trial court's use over 40 times of words to the effect that "you will *recommend* that the court sentence the defendant to life imprisonment [or] death." J.A. 610 (emphasis added).

Even taken together, we conclude that this evidence and the judge's statement "had no effect on the sentencing decision." *Caldwell,* 472 U.S. at 341, 105 S.Ct. at 2646. First, Gaskins points to no references by the state or the trial judge concerning death-sentence review. We do not believe that evidence concerning a prior vacated death sentence "improperly described the role assigned to the jury by local law." *Dugger,* 109 S.Ct. at 1215. The most that a reasonable jury could have made of this evidence was that the statute under which the jury was to sentence Gaskins might conceivably be invalidated as unconstitutional at some future date. Nowhere was there any suggestion that such invalidation was imminent or even contemplated.

■ Similarly, even taken together with the prior-death-sentence evidence, it is difficult to see how, in context, the trial judge's use of the word "recommend" could have had an effect on the sentencing decision. In an exhaustive analysis, the facts of which are not disputed here, the magistrate noted that during *voir dire,* the trial judge, the solicitor and Gaskins' attorney repeatedly told each juror that the jury could sentence to death or life imprisonment, that the jury had to make the decision, and that "the jury will be asked to decide his punishment, either life imprisonment or death by electrocution." Moreover, in each case Gaskins cites finding a *Caldwell* violation, the suggestion to the jury that its decision was merely advisory was explicit and obvious. Nowhere in this case did anyone even imply that the jury's recommendation was non-binding. Though, in retrospect, we believe a wiser course would have been for the trial judge to explicitly instruct the jury that the word "recommendation" meant "binding recommendation," under the circumstances, we are satisfied that the jury was properly aware of its sentencing responsibilities.

---

4. Because this claim is closely related to Gaskins' claim that the trial judge's sentencing-phase instructions exacerbated the *Caldwell* violation, both will be dealt with in this section of the opinion.

5. The sentence was vacated when the South Carolina Supreme Court declared South Carolina's death penalty statute unconstitutional.

**954**

Gaskins also contends that, even if there was no *Caldwell* violation, allowing testimony concerning the prior-vacated death sentence introduced arbitrary factors in the sentencing decision in violation of *Booth v. Maryland*, 482 U.S. 496, 107 S.Ct. 2529, 96 L.Ed.2d 440 (1987). Gaskins argues that this testimony implied that, regardless of whether Gaskins should be sentenced to death for Tyner's murder, the jury could properly reimpose the earlier death penalty which was, after all, only vacated because of a legal technicality. Although we agree that evidence of a prior-vacated death penalty is of limited, if any, relevance to the jury's decision whether to impose the death penalty, it is simply not a consideration so "constitutionally impermissible or totally irrelevant to the sentencing process," *Zant v. Stephens*, 462 U.S. 862, 885, 103 S.Ct. 2733, 2747, 77 L.Ed.2d 235 (1983), as to rise to the level of a violation of *Booth.*

IX

Gaskins' final assignments of error concern the trial judge's instructions to the sentencing jury to the following effect: (1) that the jury could not allow itself to be governed by sympathy; (2) that mitigating circumstances must be found beyond a reasonable doubt; (3) that the decision to impose a life sentence must be unanimous.

At the sentencing hearing, the trial court instructed the jury not to allow itself to be governed by sympathy:

You cannot allow yourselves to be governed by sympathy, by prejudice, or by passion or by public opinion. Both the state and the defendant have the right to expect that each of you will carefully and impartially consider all of the evidence in this case....

J.A. at 619. Gaskins argues that this instruction, coupled with the prosecutor's statements to the effect that Gaskins was

asking for, but deserved, no mercy, constituted an eighth amendment violation because it effectively precluded the jury from considering relevant mitigating evidence offered by Gaskins, namely his individualized appeal for compassion, understanding and mercy. *See, e.g., Caldwell*, 472 U.S. at 330–31, 105 S.Ct. at 2640–41; *Gregg v. Georgia*, 428 U.S. 153, 199, 96 S.Ct. 2909, 2937, 49 L.Ed.2d 859 (1976).

Our consideration of this issue is foreclosed by the Supreme Court's recent decision in *Saffle v. Parks*, —— U.S. ——, 110 S.Ct. 1257, 108 L.Ed.2d 415 (1990). *Parks*, considering the eighth amendment ramifications of a sympathy instruction in all material respects identical to the charge given in Gaskins' case,[6] held that to uphold such a claim would be to adopt a "new rule" under *Teague v. Lane*, 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989), that did not fall within *Teague*'s two exceptions. Accordingly, the proposed rule could not be announced or applied in a habeas case on collateral review. *Parks*, 110 S.Ct. at 1263–64. *Parks* dictates a similar rejection of Gaskins' claim here.

Gaskins next asserts that the following charge, because it used the term "reasonable doubt" so close to the term "mitigating circumstance," impermissibly suggested to the sentencing jury that mitigating circumstances must be found beyond reasonable doubt in contravention of the eighth amendment:

Before you can recommend the imposition of a life sentence, it is not necessary and I repeat, *it is not necessary for you to find beyond a reasonable doubt the existence of any alleged statutory mitigating circumstances* or any other mitigating circumstance.

While it is necessary for you to find beyond a reasonable doubt the existence of at least one alleged statutory aggra-

---

**6.** The challenged instruction in *Parks* stated that:

You must avoid any influence of sympathy, sentiment, passion, prejudice, or other arbitrary factor when imposing sentence. You should discharge your duty as jurors impartially, conscientiously and faithfully under your oaths and return such verdict as the evidence warrants when measured by these Instructions.

*Parks v. Brown*, 860 F.2d 1545, 1552 n. 8 (10th Cir.1988), *reversed*, —— U.S. ——, 110 S.Ct. 1257, 108 L.Ed.2d 415 (1990).

vating circumstance before you can recommend that the defendant be sentenced to death, it is not—*it is not required that you find beyond a reasonable doubt the existence of at least one alleged statutory mitigating circumstance in order to recommend that the defendant be given a life sentence.* As a matter of fact, *you may recommend that the defendant receive a life sentence irrespective of whether you find the existence in the evidence of an alleged statutory mitigating circumstance or not; but where you consider an alleged statutory mitigating circumstance, it is proper for you to consider only a statutory mitigating circumstance that is supported by the evidence.*

J.A. 614–15 (emphasis added). We disagree. Gaskins' strained interpretation of the trial court's jury instruction is simply not supported by its language, and does not warrant finding an eighth amendment violation.

Similarly, the trial court's statement to the effect that "you have to find at least one or more aggravating circumstances or else you will have to recommend a death sentence [presumably the trial court meant to say life imprisonment instead of death sentence]," could not, in the context of the entire charge, have confused a reasonable juror. As the South Carolina Supreme Court stated, the trial court instructions made patently clear that: (1) a death penalty could not be imposed without aggravating circumstances; (2) if statutory or non-statutory mitigating circumstances were found, a life sentence would be appropriate; (3) the jury had, in any case, full discretion not to impose the death sentence, even though aggravating circumstances and no mitigating circumstances were found. *See Gaskins,* 326 S.E.2d at 146.

Gaskins' final asserted error in the jury charge concerned the trial court's erroneous instruction to the effect that the decision to impose a life sentence must be unanimous. Gaskins contends that this incorrect instruction effectively communicated to the jury that if all members of the jury did not agree on Gaskins' sentence, then a mistrial would ensue. Thus, the erroneous instruction constituted an arbitrary factor into the sentencing, rendering the unanimous death sentence unreliable. *See, e.g., Gardner v. Florida,* 430 U.S. 349, 97 S.Ct. 1197, 51 L.Ed.2d 393 (1977).

We disagree. Although the trial court inadvertently misstated South Carolina law, it is inconceivable that the disputed instruction could have caused the jurors unanimously to impose a death sentence out of fear of mistrial should they not be unanimous in their decision to impose life imprisonment. We are satisfied that this improper instruction, viewed in context of the entire jury charge, could have had no effect on the sentencing decision. *See Caldwell,* 472 U.S. at 341, 105 S.Ct. at 2646.

X

For the foregoing reasons, we affirm the district court's dismissal of Gaskins' habeas corpus petition.

AFFIRMED.