**UNPUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

UNITED STATES OF AMERICA,
Plaintiff-Appellee,

v.                                                                    No. 94-5595

EDWIN J. JOHNSON,
Defendant-Appellant.

UNITED STATES OF AMERICA,
Plaintiff-Appellee,

v.                                                                    No. 94-5596

GARY BRUCE,
Defendant-Appellant.

UNITED STATES OF AMERICA,
Plaintiff-Appellee,

v.                                                                    No. 94-5597

JOSEPH BLOSENSKI,
Defendant-Appellant.

UNITED STATES OF AMERICA,
Plaintiff-Appellee,

v.                                                                    No. 94-5598

EDWIN J. JOHNSON,
Defendant-Appellant.

UNITED STATES OF AMERICA,
Plaintiff-Appellee,

v.                                                    No. 94-5630

HAROLD H. JOHNSON,
Defendant-Appellant.

Appeals from the United States District Court
for the District of Maryland, at Baltimore.
J. Frederick Motz, Chief District Judge.
(CR-93-355-JFM, CR-93-354-JFM)

Argued: February 2, 1996

Decided: June 19, 1996

Before NIEMEYER and LUTTIG, Circuit Judges, and DOUMAR,
United States District Judge for the Eastern District of Virginia,
sitting by designation.

_____

Affirmed by unpublished per curiam opinion.

_____

**COUNSEL**

**ARGUED:** Andrew David Levy, BROWN, GOLDSTEIN & LEVY,
Baltimore, Maryland; John DeWitt Cline, WILLIAMS & CON-
NOLLY, Washington, D.C.; Harry Jacques Trainor, Jr., GREENAN,
WALKER, TRAINOR & BILLMAN, Landover, Maryland, for
Appellants. Ira Lee Oring, Assistant United States Attorney, Balti-
more, Maryland, for Appellee. **ON BRIEF:** Martin H. Schreiber, II,
BROWN, GOLDSTEIN & LEVY, Baltimore, Maryland, for Appel-
lant Blosenski; James C. Savage, LAW OFFICES OF JAMES C.
SAVAGE, Rockville, Maryland, for Appellant Bruce. Lynne A. Bat-

2

taglia, United States Attorney, Jane F. Barrett, Assistant United States Attorney, Baltimore, Maryland, for Appellee.

_____

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

_____

**OPINION**

PER CURIAM:

Appellants were convicted of conspiracy and mail fraud following an extensive trial in the United States District Court for the District of Maryland. In these consolidated appeals, they raise numerous claims challenging their convictions. Finding no merit in any of their claims, we affirm the judgment of the district court.

I.

Eastern Waste Industries ("EWI") is a large waste management business headquartered in Annapolis, Maryland. In April 1988, EWI was acquired by Attwoods, plc, a multinational waste hauling firm headquartered in Great Britain. EWI has division offices in Annapolis, Beltsville, Finksburg, Frederick, Salisbury, and Northeast, Maryland and in Honeybrook, Pennsylvania and Delmar, Delaware.

In preparation for the Attwoods takeover, and to make its bottom line look better, EWI began large-scale billing fraud. It began secretly charging a "margin" (sometimes 50-100% of costs or more) to its commercial roll-off customers (customers from whom they pick up waste to transfer to a landfill). Additionally, it began charging for "ghost loads," landfill trips that never occurred, and, when customers became suspicious, switching tickets to show them false landfill receipts.

On August 26, 1993, appellants (all employees of EWI), four other persons, and EWI were charged with conspiracy and mail fraud. EWI

3

and two individual defendants pleaded guilty; one of those two defendants, Dean Roe, agreed to cooperate with the government. After a full trial, the jury found appellants Edwin Johnson [1] and Joseph Blosenski [2] guilty on all counts and appellants Gary Bruce [3] and Harold Johnson [4] guilty on all counts except one (a specific mailing with which they were not involved). [5] The district court then sentenced Edwin Johnson to 57 months and to a concurrent 41 months (for fraudulent government contracts, described below), Bruce to 18 months, Blosenski to 30 months and a $20,000 fine, and Harold Johnson to 54 months and a $40,000 fine. All four herein appeal.

## II.

All four appellants contend that the district court should have instructed the jury that it could find, rather than a single conspiracy, multiple conspiracies. [6] Appellants argue that the alleged single conspiracy -- a "wheel" conspiracy with the EWI regional office (Roe, Edwin Johnson, and Harold Johnson) serving as the "hub" and the five indicted division employees (Bruce, John Speake, Paul Bartle, Anthony Blosenski, and Joseph Blosenski) serving as the spokes -- lacked the necessary "rim." Although there was evidence of connections between the hub and each of the spokes (and so of individual

_____

[1] Edwin Johnson was vice president of operations for EWI beginning in December 1988.

[2] Blosenski sold his own trash hauling business to EWI in 1987 and became division manager of Honeybrook.

[3] Bruce was division manager of Northeast and, subsequently, of Annapolis, and of Delmar.

[4] Harold Johnson became president of EWI in August 1988, following the Attwoods acquisition.

[5] The remaining two individual defendants were also found guilty, but they declined to appeal their convictions.

[6] The only other argument that all four appellants raise is that the district court erred in not defining "reasonable doubt" for the jury. Although appellants admit that the rule in this circuit is that district court should not define "reasonable doubt," absent a specific jury request to do so, see United States v. Oriakhi, 57 F.3d 1290, 1300 (4th Cir.), cert. denied, 116 S. Ct. 400 (1995), they argue that this rule should be abolished, see Appellant's Br. at 29. Obviously, the panel is without authority to do so.

4

conspiracies), appellants maintain that there was not enough evidence of connections between each spoke, uniting them together in a larger conspiracy.

In light of the abundant evidence connecting all of the defendants in a single conspiracy, we conclude that the district court did not err in declining to instruct the jury on the possibility of multiple conspiracies. As we explained in United States v. Kennedy,

> [a] multiple conspiracy instruction is not required unless the proof at trial demonstrates that appellants were involved only in "separate conspiracies unrelated to the overall conspiracy charged in the indictment." Here, Ingram and Kennedy did not make an adequate showing that they were involved in conspiracies unrelated to the single conspiracy charged in the indictment. As the district court explained, although it is conceivable that Stewart's group and Kennedy's group constituted separate conspiracies, there was ample evidence that the groups were related by virtue of their extensive and long-lasting distributional relationships with Ingram. Therefore, we find that the district court's refusal to instruct on multiple conspiracies . . . was not in error.

32 F.3d 876, 884 (4th Cir. 1994) (first, third, and fourth emphases added) (citations omitted), cert. denied , 115 S. Ct. 939 (1995).

At the very least, any possible "multiple conspiracies" were not unrelated to the overall conspiracy. All of the conspirators worked for EWI. All of them were corporate officers, arranged in the corporate hierarchy. All of them were aware that it was "company policy" to charge the deceptive margins to their roll-off bills. And there was significant testimony that the policy was expressly adopted in order to improve the company's "bottom line."

Defendants rely on the fact that the divisions did not all use the same methods to charge the margins. Some used ghost loads, some used switched tickets, some charged different percentages, etc. And, they place great emphasis on the fact that different people implemented the policy in each division, and that the divisions rarely dis-

5

cussed between themselves the particulars of the overbilling. Even assuming that all of that is true,

> [o]nce it has been shown that a conspiracy exists, the evidence need only establish a slight connection between the defendant and the conspiracy to support conviction. A defendant need not have had knowledge of his coconspirators, or knowledge of the details of the conspiracy. And a defendant may be convicted despite having played only a minor role in the overall conspiracy.

United States v. Brooks, 957 F.2d 1138, 1147 (4th Cir.) (citations omitted), cert. denied, 505 U.S. 1228 (1992). The district court, accordingly, did not err in declining to instruct on multiple conspiracies.

In a related argument, defendants assert that there was a material variance between the single conspiracy alleged in the indictment and the multiple conspiracies proven by the evidence. They rely on Kotteakos v. United States, 328 U.S. 750 (1946); but there, many of the defendants had no connection with each other whatsoever, besides the fact that they had all transacted with the same individual to obtain fraudulent housing loans -- they had no connection, no relationship, and did not even know each other. Id. at 754-55. In Kotteakos, the hub was the only tie. Here, as explained above, there was far more.[7]

_____

[7] Moreover, there is no way that any possible variance affected substantial rights, thereby causing actual prejudice. See Kennedy, 32 F.3d at 884 n.1 ("Even if the evidence were read to support a multiple conspiracy instruction, the district court's failure to give such an instruction is not reversible error `unless the defendants demonstrate that they have been prejudiced by the variance' between the single conspiracy charged in the indictment and the multiple conspiracies proven at trial.").

Arguing that there was a great danger of "spillover," defendants maintain that, at the very least, the district court should have ordered severance. But, "[t]he party moving for severance must establish that prejudice would result from a joint trial, not merely that separate trials would result in a better chance of acquittal. The fact that the evidence against one defendant is stronger than the evidence against other defendants does not in itself justify severance. . . . We review a district court's

6

III.

Appellants Bruce and Edwin Johnson also argue that the district court abused its discretion when it refused to grant a new trial when the government informed it, three days following the verdict, that it had inadvertently failed to provide the jury with government exhibit 247, J.A. at 1234, which counsel had used during rebuttal but forgotten to return to the clerk to be delivered to the jury room. The exhibit in question is a chart showing the amounts refunded to EWI customers for overcharges beginning in 1982. Appellants argue that, because the chart shows overbilling before 1987 (indeed, all the way back to 1982), that it somehow tends to prove that there were multiple conspiracies. The district court found this relatively unimportant exhibit to be cumulative, and the failure to give it to the jury harmless, J.A. at 1287, a conclusion with which we fully agree.

IV.

Bruce also claims that the district court abused its discretion in permitting the following cross examination:

> Q Are you saying that Ms. Billings was wrong when she testified to that?
>
> A I am saying she is mistaken because I remember no such calls like that.
>
> . . .
>
> Q Are you saying that Mr. Roberts didn't testify truthfully when he testified?
>
> A I am saying I never asked him to bring front-end tickets into that office.

_____

denial of a motion for severance under an abuse of discretion standard." Brooks, 957 F.2d at 1145 (citations omitted). Here, the district court by no means abused its discretion in declining to try these coconspirators separately.

7

Q Sir, are you saying, sir, that Mr. Roberts was not testify-
ing truthfully?

MR. SAVAGE: Objection to the form Your Honor.

THE COURT: Sustained.

J.A. at 892-93. And, Bruce finds fault with the following statements
in the government's closing argument:

Gary Bruce also attacked the credibility of every witness
that testified and implicated him, and he told you that every
single one of those witnesses had a motive to lie. He
attacked Jackie Heimbuch, Karen Bauler, Helen Billings,
J.P. Roberts, Jennifer Sandman. It doesn't make sense,
ladies and gentlemen. It doesn't ring true. How is it that
those five people have a motive to lie?

J.A. at 1156.

Bruce cites no persuasive authority as to why these exchanges are
erroneous, and we can discern no error with them at all, particularly
in light of the trial court's sustaining of defendant's objection the
instant it was made.

V.

Appellant Joseph Blosenski raises three individual claims, none of
which have merit. First, he maintains that there was insufficient evi-
dence to convict him of conspiracy because he was ignorant about the
details of the overbilling, he rarely discussed it with others, and he did
not directly implement it himself. By his own admission, however,
Blosenski said that Dean Roe came up to Honeybrook because "they
needed to get the bottom line up." He told Blosenski to add a ton to
every load when he billed it, and to charge the customers for that non-
existent ton. Blosenski did not like this instruction, and asked if the
other divisions were doing the same thing, and Roe said "yes."
Blosenski and his wife discussed it that night, and she wanted him to
quit, but they instead decided "to go ahead and go along with what
Dean had told them to do." J.A. at 533-35.

8

Second, Blosenski complains that the trial court abused its discretion by refusing to admit testimony by two of his co-workers -- Roger Ruggeri and Karen Weiss -- that they believed that the over-billing was legal, testimony directly relevant to his asserted defense that he, too, had a good-faith belief that the practice was legal. When Ruggeri was asked if he thought the practice was "illegal or criminal," the court sustained the government's objection, saying,

> [i]llegal or criminal is a legal conclusion. Whether it is right or wrong, I am going to let you get into. Criminal and illegal is clearly improper. Why the objection wasn't made a long time ago, I don't know. . . . I will let you get close to it. I just don't think legal and criminal are the right ones to ask about. Certain things go toward good faith that I will allow you to ask.

J.A. at 419-21; see also J.A. at 447-49 (testimony of Weiss). This ruling was not an abuse of discretion.

And third, Blosenski claims that, although he was a manager of his company division, he was not a manager of the criminal activity. He did not know the details, and other people implemented it. This claim is baseless. As discussed above, he admitted that, after initial resistance, he decided "to go ahead and go along with what Dean had told them to do," after which point, the Honeybrook division began over-charging as well. That he did not supervise the day to day operations or fill out the bills himself is irrelevant; in the division, he was the ultimate decisionmaker.

VI.

Appellant Harold Johnson subpoenaed EWI counsel Stanley Klos and Attwoods chief financial officer Edwin Johnson ("Miami Edwin Johnson," not the Edwin Johnson who is an appellant here). Both, through counsel, moved to quash the subpoenas and asserted that they would plead the Fifth Amendment to any questions. The district court granted the motions to quash, in contravention, Harold Johnson argues, of Gaskins v. McKellar, 916 F.2d 941, 950 (4th Cir. 1990) ("When a witness indicates that he will assert the fifth amendment privilege, the trial judge must make a proper and particularized

9

inquiry into the legitimacy and scope of the witness' assertion of the privilege. A witness may be totally excused only if the court finds that he could legitimately refuse to answer any and all relevant questions."), cert. denied, 500 U.S. 961 (1991).**8**

Harold Johnson argues that Miami Edwin Johnson was necessary for his defense that it was not his fault that refunds were delayed over a year because Miami Edwin Johnson was in charge of the refund program during that time. And, he argues that Klos was necessary to his defense that he was behaving on advice of counsel (Klos) that the overbilling was legal.

At the time of the subpoenas, Miami Edwin Johnson had been informed by the Government that he was the target of an active criminal investigation concerning these and related matters. His counsel informed the court that he would plead the Fifth to "every question" but his name.**9** J.A. at 586, 594. The court then invited Harold Johnson's counsel to make a proffer as to what Miami Edwin Johnson would testify to, as required by Fed. R. Evid. 103(a)(2), but counsel declined to do so because the court was unwilling to hear the proffer in camera. J.A. at 591-95. When the issue came up again later, Harold Johnson's counsel said simply that he wanted Miami Edwin Johnson to testify that Harold Johnson had called him in Miami in 1990 and that Miami was "running the show" from that point on. J.A. at 692-93. The court responded,

> it seems to me that there is already evidence that Miami corporate was involved in the refund decision. I would think that the government's position is probably they don't care who is controlling it. The fact of the matter is it is not a

_____

**8** In Gaskins, however, (which discussed this issue in only three short paragraphs) the court concluded that "the trial court's refusal to require [the witness] to assert his fifth amendment privilege before the jury was in any event harmless . . . [because] [the witness's] testimony would have been merely cumulative." 916 F.2d at 950. The court, here, also concluded that the testimony would have been cumulative. J.A. at 696.
**9** Likewise, counsel for Klos stated that he would argue attorney/client privilege, work/client privilege, and, if those both failed, he would plead the Fifth Amendment. J.A. at 691.

10

defense that somebody else -- assume for the moment that Miami corporate was heavily involved in the refund, that you say so what?

MR. ORING: Your Honor, the first defense witness is going to be Dennis O'Leary. I think he is being called exactly for the purpose of trying to demonstrate it was Miami that was controlling this. . . . [The prosecution] would agree that certainly Miami was involved in 1991.

J.A. at 694.

Therefore, based on the fact that testimony that Miami was controlling the refunds[10] would be largely irrelevant and cumulative with Dennis O'Leary's testimony, and based on the fact that counsel both for Miami Edwin Johnson and for Klos stated that their clients would plead the Fifth Amendment in any event, we conclude that the court did not abuse its discretion in quashing the subpoenas.

VII.

Edwin Johnson also challenges the district court's computation of the loss that resulted from a separate fraudulent transaction in which he participated. In January 1990, EWI acquired another sanitation company, Montgomery County Sanitation ("MCS"). While negotiating that acquisition, Edwin Johnson discovered that MCS had been defrauding Montgomery County, Maryland. Montgomery County code provides that the county will contract only with firms that demonstrate that a minimum of 20% of the value of the contract is subcontracted to minority-owned businesses. In order to take advantage of this regulation, MCS had created sham minority businesses, con-

---

[10] In his general proffer, Harold Johnson stated only that he wished to show that Miami was controlling the refunds, so he cannot now claim to have been seeking different testimony. Fed. R. Evid. 103(a)(2). Despite Harold Johnson's assertion in his brief before this court that Klos was being called to bolster his good faith/advice of counsel defense, there was no proffer whatsoever to that effect before the trial court; the only reason that the trial court was told that Harold Johnson wanted Klos was to help prove that Miami was running things.

11

sisting entirely of minority employees of MCS with no personal assets, and had subcontracted 20% of its contracts to them (then recouping 85% of it through sham lease agreements). Edwin Johnson not only approved of these phony transactions, he actively participated in them by firing one of the minority employees running a subcontracting business, setting up another minority employee in his place, and then upping the lease payback to 90% and then to 92.5%.

As a result, Edwin Johnson was convicted in a separate trial of fraud, and the district court increased his offense level of six by eleven levels under U.S.S.G. § 2F1.1(b)(1)(L) because the resultant loss was "between $800,000 and $1,500,000." U.S.S.G. § 2F1.1 Comment 8 requires only a "reasonable estimate" of the loss caused by fraud, and that is exactly what the district court made. It estimated the loss in two ways: first, it found that EWI earned a profit of 15% on the $5,500,000 worth of contracts that it would not have received without the sham minority subcontractors, for a total of $825,000; alternatively, it found that 20% of the total payments EWI received, $1,100,000, should have gone to a minority subcontractor instead. Edwin Johnson challenges the former calculation because he asserts that there was no "victim" who actually suffered this loss, and he attacks the latter as being improperly based on gross rather than net revenues. We conclude that neither challenge has merit. The former method was acceptable because the county was a victim in that it did not get what it bargained for -- increased minority businesses -- and so EWI's illicit gain is an appropriate measure of damages, and the latter method is acceptable as well because the county's goal was to promote minority businesses by upping their total revenue and legitimacy, not just their profits. And, in any event, the alleged error had no effect on Edwin Johnson's sentence because the district court sentenced him to 41 months in the minority contracting case, to run concurrently with the 57 months he got in the billing fraud case.

CONCLUSION

For the reasons stated herein, the judgment of the district court is affirmed.

AFFIRMED

12