**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

---

**No. 23-4236**

---

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

ERIC FRU NJI, a/k/a Eric Fru Ngi,

Defendant - Appellant.

---

**No. 23-4284**

---

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

WILSON NUYILA TITA,

Defendant - Appellant.

---

**No. 23-4387**

---

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

WILSON CHE FONGUH,

Defendant - Appellant.

---

Appeal from the United States District Court for the District of Maryland, at Baltimore. Richard D. Bennett, Senior District Judge. (1:21-cr-00334-RDB-2)

---

Argued: September 12, 2025                    Decided: November 18, 2025

---

Before NIEMEYER, GREGORY, and HARRIS, Circuit Judges.

---

Affirmed by published opinion. Judge Niemeyer wrote the opinion, in which Judge Gregory and Judge Harris joined.

---

**ARGUED:** Erin Margaret Trodden, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Charlottesville, Virginia; Robert James Wagner, ROBERT J. WAGNER PLC, Richmond, Virginia; Justin Eisele, SEDDIQ LAW FIRM, Rockville, Maryland, for Appellants. Mary Jessica Kirsch Munoz, OFFICE OF THE UNITED STATES ATTORNEY, Greenbelt, Maryland, for Appellee. **ON BRIEF:** Miriam Z. Seddiq, SEDDIQ LAW FIRM, Rockville, Maryland, for Appellant Wilson Che Fonguh. Kelly O. Hayes, United States Attorney, Greenbelt, Maryland, David C. Bornstein, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Baltimore, Maryland, for Appellee.

2

NIEMEYER, Circuit Judge:

In connection with their secret efforts to provide arms and ammunition to Anglophone fighters in Cameroon, Wilson Tita, Eric Nji, and Wilson Fonguh were convicted in the District of Maryland of (1) conspiracy to export arms and ammunition from the United States without an export license, to conceal such exports and smuggle them, and to transport firearms with obliterated serial numbers, in violation of 18 U.S.C. § 371; (2) transporting firearms with obliterated serial numbers, in violation of 18 U.S.C. § 922(k); and (3) smuggling firearms, ammunition, and related items, in violation of 18 U.S.C. § 554(a). The district court sentenced each defendant to 63 months' imprisonment, at the bottom of the sentencing range determined by the court to be applicable, and to a two-year term of supervised release.

The defendants appealed, challenging (1) the sufficiency of the evidence, (2) some of the district court's evidentiary rulings, (3) some of its jury instructions, and (4) some of its sentencing rulings. As we explain herein, we find no reason to disturb either the defendants' convictions or their sentences, and therefore we affirm.

I

When longstanding sectional tensions in their native country of Cameroon erupted into armed conflict, Wilson Tita, Eric Nji, and Wilson Fonguh joined with several other Cameroonian Americans to form a group dedicated to sending weapons and ammunition to Anglophone fighters in Cameroon who were battling the Francophone government's forces. The group — nicknamed by its members as the "Peanut Project," in reference to

3

their code word for bullets — met regularly at the home of Tamufor St. Michael, in Baltimore County, Maryland. His relatively small basement — referred to by members as "the lab" — served as the group's base of operations and manufacturing site. The Peanut Project was well organized, having written bylaws that referred to members as "council members" and preparing formal minutes of meetings. It also was careful to maintain secrecy, with its members communicating regularly through encrypted messages over WhatsApp and in closed in-person meetings at the lab. Indeed, a bylaw required secrecy, which the members policed. St. Michael — who had previously served in the U.S. military, had taken gunsmithing classes, and had extensive knowledge of firearms — set up the lab with the equipment and supplies necessary for members to clean, prime, and refurbish ammunition; to assemble firearms; to prepare firearms and other items for shipping; and to maintain records. The items prepared there for shipping were wrapped in "layers and layers" of aluminum foil, plastic wrap, and duct tape and were packaged in a manner designed to conceal them.

Although the Peanut Project began operating in late 2017, it did not come to the attention of the U.S. government until February 2019, when law enforcement agents received a tip about a particular 40-foot shipping container onboard a cargo ship travelling from the Port of Baltimore to Nigeria, which is adjacent to Cameroon. Rather than off-loading the container in Nigeria, authorities returned it to Baltimore, where law enforcement agents recovered over 35,000 rounds of ammunition and 39 firearms from among vehicles and other cargo shipped in the container. Nine of the firearms had been privately manufactured and did not have serial numbers, but 28 other firearms had serial

4

numbers that had been obliterated, leaving behind coarse grinding marks on the firearms. Most of the firearms and much of the ammunition were found hidden inside compressor tanks, which had been cut open, filled with carefully wrapped packages and spray foam, welded back together, and repainted. The shipping container also contained other military equipment, including rifle scopes, gunpowder, Tannerite (a commercially available kit to make exploding targets), empty shell casings, machetes, trip wire, and military clothing. Law enforcement agents traced the shipping container to St. Michael and then obtained a warrant in July 2019 to search his house. Upon execution of the warrant, the agents discovered "a full-scale manufacturing operation" for reloading ammunition and manufacturing firearms.

A federal grand jury returned a superseding indictment against Tita, Nji, and Fonguh, charging them in five counts with (1) conspiracy, in violation of 18 U.S.C. § 371; (2) exportation of defense articles without a license, in violation of the Arms Export Control Act, 22 U.S.C. § 2778; (3) exportation of controlled items without a license, in violation of the Export Control Reform Act, 50 U.S.C. § 4819; (4) transportation of firearms with obliterated serial numbers, in violation 18 U.S.C. § 922(k); and (5) smuggling, in violation of 18 U.S.C. § 554(a).

At the 10-day jury trial, the government presented testimony from 12 witnesses, 2 of whom had been members of the group. The two members explained in detail the operations and the defendants' involvement in them. In his defense, Tita called St. Michael as a witness, and both Nji and Fonguh testified in their own defense. The jury found the defendants guilty of conspiracy (Count I), the transportation of firearms with obliterated

5

serial numbers (Count IV), and smuggling (Count V), and it acquitted them on Counts II and III, which charged violations of the Arms Export Control Act and the Export Control Reform Act.

After the defendants filed post-trial motions, challenging the sufficiency of the evidence and various rulings made by the district court during trial, the case was reassigned to a different district judge, who conducted a hearing on the motions and then denied them.

In preparation for sentencing, the probation officer prepared a presentence report for each defendant that recommended, among other things, applying a 6-level sentencing enhancement under U.S.S.G. § 2K2.1(b)(1)(C) because the conspiracy involved 25 to 99 firearms, and a 4-level sentencing enhancement under § 2K2.1(b)(5) based on the defendants' engaging in the "trafficking of firearms." Nji and Fonguh challenged both recommended enhancements, while Tita challenged only the latter, and the district court overruled their objections. The court then calculated the advisory sentencing range to be 63 to 78 months' imprisonment for each defendant and sentenced each defendant at the bottom of that range to 63 months' imprisonment, along with two years of supervised release.

From the district court's judgments dated March 22, 2023, April 5, 2023, and May 25, 2023, the defendants filed these appeals, which we then consolidated.

II

The defendants contend first that the evidence presented by the government was insufficient to support their convictions under § 922(k) (Count IV), and derivatively under

6

§ 554(a) (Count V) and § 371 (Count I). They argue mainly that the evidence was insufficient to show their *mens rea* for the § 922(k) offense — *i.e.*, that they knew that the serial numbers on the firearms had been obliterated.

This argument is a difficult one for the defendants to make, as they bear a "heavy burden" in seeking to overturn a jury conviction for insufficient evidence. *United States v. Hunt*, 99 F.4th 161, 184 (4th Cir. 2024) (cleaned up). They must show that "after viewing the evidence in the light most favorable to the prosecution, [no] rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). And under this standard, a court is required to draw all reasonable inferences in the government's favor and to "assume that the jury resolved all contradictions in testimony" in its favor as well. *United States v. Freitekh*, 114 F.4th 292, 308 (4th Cir. 2024) (quoting *United States v. Penniegraft*, 641 F.3d 566, 572 (4th Cir. 2011) (cleaned up)). Thus, "reversal for insufficient evidence is reserved for the rare case where the prosecution's failure is clear." *Id.* (cleaned up).

Under this standard, we conclude that there was ample evidence to support the jury's finding that the defendants were aware of the obliteration of the firearms' serial numbers and had the necessary *mens rea* for violating § 922(k).

First, the Peanut Project was a small, closely knit group dedicated to shipping firearms and ammunition to Anglophone fighters in Cameroon. And part of their mission was to conceal the source of firearms, especially because of a past incident in which the Cameroonian government was able to trace a firearm back to the United States based on its serial number. Concealing serial numbers on the firearms thus became a fundamental

7

element of their work, and they accomplished it by grinding the serial numbers off of the purchased firearms they sent to Cameroon. The grinding was done in the Peanut Project's lab, which was a small, compact space where members could hear each other and generally could know what the others were doing. There was evidence that verbal instructions to grind firearms were given in the presence of two of the defendants, Nji and Fonguh, and that the grinding operation was both noisy and obvious. Moreover, each ground firearm was visibly defaced with a large, ill-defined grind area that would have been readily visible, especially to anyone handling or packaging it. And firearms so defaced were indeed packaged in the lab for further concealment. The operations in the lab, while kept secret from the outside world, were open and visible to all members present, and the members, including the defendants, participated in lab work over a lengthy period, working in the lab up to three days each week. In these circumstances, a jury had circumstantial evidence that all members present in the lab were familiar with its mission and operations and knowingly participated in their fulfillment.

At trial, the government presented the testimony of two former Peanut Project members who knew the operations and worked with the defendants in particular. Roger Akem testified that the Peanut Project group packaged and concealed the weapons and ammunition they were shipping to Cameroon "[s]o that [they] can be hidden from" both "[t]he authorities here in the U.S. and [those in] Nigeria." He added that "*the understanding of the group*" was that "we had to conceal it" because "[t]here was no way you could send it out without concealing." (Emphasis added). He also testified that the

8

defendants knew of and participated in this mission and, indeed, that each of the defendants came to the lab to help in shipping preparations.

The government also presented testimony of Alambi Muma, another former member of the Peanut Project, who testified that, from the outset of the project, "*all of us that came together . . . decided" to keep the activities secret*, "[b]ecause to some extent, we underst[ood] that" if the American authorities or the Cameroonian authorities found out, "they're going to stop us and it's illegal." (Emphasis added). Indeed, the group's bylaws, drafted by Tita, contained an entire section emphasizing the importance of the group's "concealment methods." And as to the specific function of the defendants, Muma testified that Nji was sometimes responsible for taking notes and performing inventory for the group, that Nji and Fonguh would prepare ammunition and would help load and package the arms and ammunition, and that Tita would oversee what they were doing and give them directions. He stated also that at a time when Nji and Fonguh were in the lab with him, St. Michael verbally assigned the task of grinding off serial numbers to him with instructions that the others could hear. And when Muma began the task of grinding, he donned gloves and goggles and used a grinder that was noisy, which made his activity especially noticeable. Muma also testified that he usually went to the lab with Nji and Fonguh and that when he was performing the grinding function, he could see the other people who were in the basement — "It's in a small space, a very small space like about three, three meter square."

Finally, the government presented the jury with some of the actual guns seized with the serial numbers obliterated and photographs of the remaining guns seized with serial

9

numbers obliterated, all of which revealed highly visible defacing of the guns where the serial numbers had been located, such that anyone seeing them or packaging them would have seen the defacing.

We conclude that this evidence was sufficient to allow the jury to find that Tita, Nji, and Fonguh knew that serial numbers were being or had been obliterated on firearms that the group was shipping to Cameroon. And even if the jury had doubts as to whether the defendants had *actual* knowledge, it certainly could have concluded that the obliterations were reasonably foreseeable to them in furtherance of the conspiracy that they had joined, as necessary for vicarious liability under *Pinkerton v. United States*, 328 U.S. 640 (1946). *See United States v. Ashley*, 606 F.3d 135, 142–43 (4th Cir. 2010) (explaining that "[t]he *Pinkerton* doctrine makes a person liable for substantive offenses committed by a co-conspirator when their commission is reasonably foreseeable and in furtherance of the conspiracy").

The defendants also argue that the government failed to prove that the weapons in question were actually firearms, as that term is used in § 922(k). The relevant statute defines "firearm" to include a "weapon . . . which will or is designed to or may readily be converted to expel a projectile by the action of an explosive." 18 U.S.C. § 921(a)(3). The defendants' argument, however, develops little traction. As the defendants concede, the government brought many of the guns to court for the jury to see and presented photographs of all of them. In addition, law enforcement officers who found the weapons identified them specifically by manufacturer, make, and model. They also found ammunition packaged with the weapons, suggesting strongly that they were firearms. And, as the

10

government emphasizes, the whole point of the operation was to send firearms and ammunition to Anglophone fighters in Cameroon to assist them in their fight with the Francophones. Clearly, the jury could conclude that the guns in question were, in fact, "firearms."

In sum, we conclude that the evidence was sufficient to support the defendants' convictions under § 922(k) (Count IV), as well as § 554(a) (Count V) and § 371 (Count I).

## III

The defendants contend next that the district court abused its discretion in granting the government's motion to exclude testimony from the defendants' expert, Efi Walters Tembon, described by the defendants as a native of the Anglophone section of Cameroon who was forced to flee the country in 2018 due to abuses and threats by the Francophone government. The defendants proffered that Tembon would testify about the armed conflict between the Cameroonian government and Anglophone Cameroonians and how "the Cameroonian government [had] engaged in violent acts of retaliation even against non-violent dissent and protests." The defendants argued that such evidence was critical to support their contention that the concealment of their activities was part of an effort to keep their friends and families in Cameroon safe, rather than reflecting knowledge that their activities were illegal.

The district court, however, granted the government's motion to exclude Tembon's testimony, explaining that the defendants' state of mind could not be proved through expert testimony and that, in any event, expert testimony as to "the details of the Cameroonian

11

conflict" was more likely to confuse the jury than help it. The court assured the defendants, however, that they could offer other evidence along this line to explain the reason for the secrecy of their operations.

On appeal, the defendants argue that the evidence was relevant and should have been admitted, as it went to the defendants' state of mind. They acknowledge that an expert cannot offer an opinion as to a defendant's mental state under Federal Rule of Evidence 704(b), but they note that the Supreme Court has made clear that expert witnesses can provide information that jurors can then use in deciding a defendant's mental state for themselves. *See Diaz v. United States*, 602 U.S. 526 (2024). While there may be two sides to this issue, we conclude that the district court's decision fell well within its discretion to manage the trial fairly. In its ruling, the district court explained that the expert had a particular "point of view" about the conflict that "may very well be valid," but that admitting his testimony would create "a great risk of allowing the jury to assume there is some justification" for the defendants' conduct. The court also noted that the expert's testimony would have only minimal, indirect relevance as to why the defendants exhibited their high concern over keeping operations secret. But the court nonetheless allowed the defendants, through other testimony, to explain the conflict and their fear of the Cameroonian government and thereby provide direct evidence of their state of mind. And indeed, they did so.

In these circumstances, we conclude that the district court did not abuse its discretion in avoiding a distracting, collateral mini-trial about the nature and merits of the conflict in Cameroon.

12

IV

The defendants also contend that the district court abused its discretion in making rulings that denied them the ability to introduce a pretrial statement made by a coconspirator, Tse Bangarie. Specifically, prior to pleading guilty, Bangarie participated in a proffer session with the government with the idea of reaching a cooperation agreement. According to the government's record of the proffer:

> Bangarie warned St. Michael about the illegality of shipping arms from the U.S. to Cameroon. St. Michael claimed that he had the military training on how to conceal shipments and even had a badge to get what he needed accomplished. Further, St. Michael suggested to Bangarie that his military superiors knew what he had planned to do and thus convinced Bangarie that there was no need for concern. Bangarie did think it was possible that he could have been guided by his military superiors.

The defendants wanted to introduce this statement into evidence and to question Bangarie about it — and only it, as defendants' counsel assured the court — to demonstrate that they had relied on St. Michael's claim that their exportation of arms to Cameroon was legitimate. To that end, the defendants subpoenaed Bangarie to testify at trial, and Bangarie indeed appeared in court with his counsel. But Bangarie's counsel advised the court that Bangarie would "be asserting his Fifth Amendment privilege not to incriminate himself if he were called to the stand," noting that while he had pleaded guilty to certain offenses, he was still awaiting sentencing.

The court concluded that, in the circumstances, Bangarie's "Fifth Amendment assertion [was] valid" because "he could be exposing himself to liability" since his conviction was not yet final and since the government did not accept the truthfulness of the statement that he had made in the proffer session. As the court explained:

13

> Mr. Bangarie . . . has pled guilty.  He has not yet been sentenced.  It is not a final conviction in that sense.  It is possible — I'm not expecting it, but it is possible that he could even move to withdraw his guilty plea.  It is not a final sentence, and there's not a final conviction at this point.
>
> Moreover, as the Government has indicated, they do not, have not accepted the truth of that particular statement.  We might note that this was a proffer session that did not result in a cooperation agreement.  And the content of that particular piece of Mr. Bangarie's proffer is not necessarily consistent with the statement of facts that he swore to under oath.
>
> So I do believe that he could be exposing himself to liability in a couple of different ways:  Possibly as to the facts of this case given that it's not a final conviction and possibly because of the issue of the truthfulness of that particular statement.

The court then ruled that Bangarie need not take the stand.

In response, the defendants then requested that the court admit Bangarie's statement into evidence under Federal Rule of Evidence 807, which is the residual exception to the hearsay rule of evidence.  That Rule allows the admission of hearsay evidence if it is "supported by sufficient guarantees of trustworthiness" and "is more probative on the point for which it is offered" than any other reasonably available evidence.  Fed. R. Evid. 807(a).  The court, however, also denied this request, explaining:

> A proffer statement not accepted by the Government, not under oath, I don't think has a great deal of circumstantial guarantees of trustworthiness.  On top of that, Mr. St. Michael, who did testify, denied having made such a statement.  [Yet,] Rule 807 is looking for a statement that is more probative on the point for which it's offered than any other evidence the proponent can obtain through reasonable efforts.

The defendants now contend that the district court violated their Sixth Amendment right to compel testimony and their Fifth Amendment right to a fair trial when it barred them from examining Bangarie "on a question-by-question basis."

14

Our review of "whether a district court violated a defendant's right to a complete defense by improperly permitting a witness to invoke the right against self-incrimination" is conducted under the deferential abuse-of-discretion standard. *United States v. Oliver*, 133 F.4th 329, 335 (4th Cir. 2025).

To be sure, as we have repeatedly recognized, "[w]hen a witness asserts a right against self-incrimination that may conflict with a defendant's right to present a complete defense, the district court 'must make a proper and particularized inquiry into the legitimacy and scope of the witness' assertion of the privilege.'" *Oliver*, 133 F.4th at 336 (quoting *Gaskins v. McKellar*, 916 F.2d 941, 950 (4th Cir. 1990)). Moreover, "[a] witness may be totally excused only if the court finds that he could legitimately refuse to answer any and all relevant questions." *Id.* at 337 (quoting *Gaskins*, 916 F.2d at 950). But we have also explained that the district court is not required to have the witness take the stand and "assert the privilege on a question-by-question basis" when the record reflects that "the district court's decision to permit invocation of the privilege was not overbroad." *Id.* at 337–38.

The record reflects that the district court conducted the requisite "proper and particularized inquiry" and that the scope of the privilege afforded to Bangarie was not overbroad. Significantly, the district court confirmed that the *only* subject on which defendants' counsel wanted to question Bangarie was the single statement he had made during the proffer session with the government. In that statement, Bangarie suggested that St. Michael had "convinced [him] that there was no need for concern" because St. Michael had "a badge" and approval from "military superiors." But that statement appeared to be

15

inconsistent with the subsequent statement of facts to which Bangarie swore *under oath* when pleading guilty. He admitted during his plea that he had known it was illegal for the group to ship defense items overseas. Given that context and the fact that Bangarie's conviction was not yet a final judgment, we conclude that the district court reasonably concluded that compelling Bangarie's limited testimony on this issue could potentially expose him to additional adverse consequences. *See Mitchell v. United States*, 526 U.S. 314, 326 (1999) (recognizing that "[w]here the sentence has not yet been imposed a defendant may have a legitimate fear of adverse consequences from further testimony").

We also conclude that the district court did not abuse its discretion in declining to admit the government's report of Bangarie's pre-plea statement into evidence under Federal Rule of Evidence 807. That residual hearsay exception requires that the hearsay statement be "supported by sufficient guarantees of trustworthiness" and that it be "more probative" than other available evidence. Fed. R. Evid. 807(a). The court found neither criterion satisfied, and we conclude that it had ample reason to do so.

In short, the district court did not abuse its discretion in ruling that Bangarie need not take the stand after validly invoking his Fifth Amendment privilege against self-incrimination and in denying the defendants' request to admit the statement made by Bangarie during the proffer session.

V

As to their last argument on their convictions, the defendants contend that the district court erred by (1) instructing the jury under the *Pinkerton* standard for liability,

16

(2) granting a willful blindness instruction, and (3) providing the jury a legally insufficient definition of "knowingly" in the conspiracy instruction. Taken together, and also with the court's aiding and abetting instruction, the defendants argue that the instructions "deprived [them] of a fair trial" by "reducing the standard of the government's proof well below the constitutional requirement of proof beyond a reasonable doubt."

First, with respect to the *Pinkerton* instruction, we note that the district court correctly understood that under *Pinkerton*, a defendant engaged in a conspiracy can become liable for the substantive crimes of his coconspirators that were reasonably foreseeable and done in furtherance of the conspiracy. *See* 328 U.S. at 645–48; *see also Ashley*, 606 F.3d at 142–43. And the defendants do not challenge the substance of the district court's instruction as a correct statement of the law. Rather, they argue that "there was an insufficient evidentiary foundation" to warrant giving the instruction because the jury could not find from the evidence presented that the obliteration of firearm serial numbers was "reasonably foreseeable" to members of the conspiracy.

We believe, however, that this argument overlooks extensive evidence demonstrating the mission of the group, its prior adverse experience related to a firearm with a visible serial number, and its overriding efforts to keep their activities concealed. Indeed, the group's bylaws emphasized the importance of their "concealment methods." Moreover, the group was a small and closely knit, operating over an extended period of time in a small space dedicated to preparing firearms and ammunition for shipment and packaging them in disguise. Given the group's purpose, methods, and mission, a jury certainly could find that it would have been at least reasonably foreseeable to any member

17

that other members would obliterate the serial numbers on the firearms they were shipping to Cameroon to prevent those firearms from being traced back to the group and exposing their activities.

The defendants argue alternatively that, in any event, "the case was far too complex to allow for *Pinkerton* vicarious liability," pointing to *United States v. Serrano-Delgado*, 29 F.4th 16 (1st Cir. 2022), which warned that "in some complex cases, the charge can cause confusion," particularly when "the jury is being asked to infer" that a conspiracy existed from "a series of disparate criminal acts." *Id*. at 24 (cleaned up). But the circumstances there are far removed from the circumstances presented in this case. We conclude that the application of *Pinkerton* was clearly appropriate here.

The defendants also challenge the willful blindness instruction, again arguing that there was not enough evidence to justify giving it. To be sure, we have recognized that "'requests for willful blindness instructions should be handled with caution,' because of the risk that the instruction could mislead a jury into believing that it could convict the defendant for his mere negligence or recklessness with respect to a key fact making his conduct illegal." *United States v. Hale*, 857 F.3d 158, 168 (4th Cir. 2017) (quoting *United States v. Jinwright*, 683 F.3d 471, 478 (4th Cir. 2012)). "Nonetheless, it is appropriate to instruct the jury on willful blindness when the defendant claims lack of guilty knowledge in the face of evidence supporting an inference of deliberate ignorance." *Id.* (cleaned up). For the doctrine to apply, two basic requirements must be satisfied — (1) that the defendant subjectively believed there was a high probability that a fact existed and (2) that the

18

defendant took deliberate actions to avoid learning that fact. *Id.*; *see also Global-Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754, 769 (2011).

Here, as noted, there was ample evidence from which to find that the defendants had actual knowledge that the group was obliterating the serial numbers on firearms before packaging them in disguise and sending them overseas. But from that same evidence, a jury could also reasonably conclude that if, as the defendants maintained, they did lack actual knowledge, they could have avoided learning of the obliteration operations only by taking deliberate actions to avoid confirming what they must have surely strongly suspected. For instance, the jury could conclude that Nji and Fonguh almost certainly participated in helping to wrap the firearms in "layers and layers" of plastic wrap, aluminum foil, and duct tape as a part of the concealment efforts, giving them ample opportunity to personally observe the irregular grinding marks on the firearms where the serial numbers had been obliterated. Yet, if the jury were to believe the defendants that they only helped load the packages containing the firearms once they were already wrapped, it could reasonably infer, in the context of the mission and their membership in the group, that this reflected a deliberate choice by the defendants to avoid handling the firearms directly.

Finally, the defendants challenge the district court's instruction about "knowledge," which told the jury that "[t]he defendant's knowledge, again, it's a matter of inference. It's a matter you may infer from the facts that have been proved." They argue that "[p]lacing such an emphasis on a jury's reliance on inferences diverts them from their principal obligation — to find that there was an agreement to violate the law and that the defendant

19

knowingly and voluntarily entered into that unlawful agreement." But the instruction is clearly not objectionable, as it simply told the jury that the key element of knowledge was one that "may" be inferred from circumstantial evidence.

At bottom, we conclude that the district court did not err in giving the jury the instructions that the defendants have challenged.

VI

As to their sentencing, the defendants contend first that the district court erred in applying a 6-level enhancement under U.S.S.G. § 2K2.1(b)(1)(C), which applies when the "the offense involved" 25 to 99 firearms, and a 4-level enhancement under § 2K2.1(b)(5), which, at the time, applied when "the defendant engaged in the trafficking of firearms." They argue that the district court applied the wrong legal standard when evaluating relevant conduct and failed to make the "required particularized findings" necessary to support the enhancements' application. More specifically, the defendants argue that "the district court relied simply on the fact of the defendants' convictions to impose the enhancements in this case" and that "[t]his was error" because, as they maintain, the "jury instructions permitted the defendants to be convicted under *Pinkerton*," whereas "the standard for relevant conduct under § 1B1.3 of the Guidelines is narrower." And the error, they contend, was even more pronounced with respect to § 2K2.1(b)(5) because that enhancement did not even encompass § 1B1.3's accountability for jointly undertaken criminal activity. Finally, Tita acknowledges that he did not object to the 6-level enhancement based on the number of firearms involved, but he maintains that we should nonetheless correct the error under

20

the plain-error standard. The defendants request that we vacate their sentences and remand to the district court for more particularized findings as to these two enhancements.

The defendants were convicted of conspiracy to, among other things, transport firearms with obliterated serial numbers and smuggle them. In the presentence reports prepared for them, the probation officer recommended applying the 6-level enhancement, stating in Tita's and Nji's reports that "[t]he offense involved 28 firearms" and using similar language in Fonguh's report. (Citing U.S.S.G. § 2K2.1(b)(1)(C)). The reports also stated, "The defendant trafficked in firearms, . . . therefore 4 levels are added." (Citing U.S.S.G. § 2K2.1(b)(5)). Those reports were provided to the defendants before sentencing.

The defendants, except for Tita, objected to the 6-level enhancement recommended in the presentence report, stating, as Nji argued:

> Mr. Nji was given 6 levels based upon the assumption that 28 firearms with obliterated serial numbers were the subject of the offenses for which the jury found Mr. Nji guilty. . . . Based upon . . . the fact that the government did not prove the number of obliterated firearms *which were known by Mr. Nji*, Mr. Nji is entitled to the minimum number of levels of adjustment for the minimum number of obliterated firearms.

(Emphasis added). And Fonguh made a similar objection. During sentencing before the district court, the defendants again made the same argument. As Nji's counsel stated:

> Our point in this was that there are a lot of firearms involved. There were a lot of activities on the parts of different people. There was a defense of — some of the defenses raised by all the three co-defendants were who was present when certain actions were taking place, who was involved in packing, when were they involved in packing, what were they packing, what were they packing, who was involved in obliterating serial numbers? When? Who was present when that happened?

Counsel thus concluded:

21

So all the jury found was that there was a trafficking and a smuggling, and in order to find that they would have had to find that there was trafficking of firearms and smuggling of firearms. But there was never a finding as to how many firearms my client was involved in trafficking, how many firearms my client was involved in smuggling.

In response, the court noted that the defendants were also convicted *of conspiracy*, which would make each of them responsible for relevant conduct under U.S.S.G. § 1B1.3. It then found, "He's a member of a conspiracy, and was found guilty of being a member of a conspiracy to transport and smuggle weapons. And . . . *the evidence* was that there were 28 weapons *involved*." (Emphasis added). The court explained that it did not understand why there had to be proof with respect to each defendant about the number of firearms that were involved *as to that defendant*. Accordingly, it overruled the defendants' objections to the application of the 6-level enhancement under § 2K2.1(b)(1)(C).

Contrary to the defendants' argument, we cannot find that the district court confused *Pinkerton* liability with the scope of relevant conduct under U.S.S.G. § 1B1.3. The district court did not rely on or mention *Pinkerton* principles when addressing relevant conduct. This fact alone renders inapplicable the ruling in *United States v. Evans*, 90 F.4th 257, 263 (4th Cir. 2024), on which the defendants rely. Rather, the court found that the offense jointly undertaken by the defendants involved more than 25 firearms.

Under the Sentencing Guidelines, the 6-level enhancement under § 2K2.1(b)(1)(C) applies when "*the offense involved*" 25 to 99 firearms. It does not suggest that each defendant must know of the firearms; rather, *the offense* of which the jury found the defendant guilty must *involve* at least 25 firearms. Thus, for the enhancement to apply, each defendant need not have known precisely how many firearms their coconspirators

22

transported or attempted to transport to Cameroon or that the coconspirators obliterated the serial numbers on 28 of those firearms. Rather, under § 1B1.3, each defendant becomes accountable for the acts of others that were within "the scope of the criminal activity the particular defendant agreed to jointly undertake," so long as those acts are "in furtherance of that criminal activity" and "reasonably foreseeable in connection with that criminal activity." U.S.S.G. § 1B1.3(a)(1)(B) & cmt. n.3(B). Having been found guilty of a single conspiracy to transport and smuggle firearms with obliterated serial numbers, the defendants' circumstances fit the accountability requirements of § 1B1.3.

The district court simply applied these principles, finding that the defendants had been convicted of conspiracy for their role in the Peanut Project and that the evidence showed that 28 firearms with obliterated serial numbers had been transported pursuant to that conspiracy. It explained correctly that there was no support for the defendants' argument that they each had "to know the exact number of firearms with obliterated serial numbers" when conducting the "relevant conduct analysis under 1B1.3."

And as to the court's finding "that there were 28 weapons involved," the defendants have not disputed the number. Indeed, the record shows that the government introduced physically or through photographic evidence each of the 28 firearms on which the serial number had been obliterated. And the presentence report concluded that 28 firearms were involved. As the court concluded, "I don't really see what the basis is for challenging the plus 6 offense increase." We agree. The court's conclusion that 28 firearms were involved in the offense was not clearly erroneous.

23

The analysis of the defendants' challenge to the 4-level enhancement under § 2K2.1(b)(5) for engaging in the trafficking of firearms is slightly different, but our conclusion is the same.  Under the version of the Sentencing Guidelines in effect at the time of sentencing, § 2K2.1(b)(5) provided for a 4-level enhancement if "*the defendant* engaged in the trafficking of firearms." U.S.S.G. § 2K2.1(b)(5) (2021) (emphasis added). As the defendants note, the Guidelines' commentary explained that the use of "[t]he term '*defendant*,' consistent with § 1B1.3 (Relevant Conduct), limits the accountability of the defendant to the defendant's own conduct and conduct that the defendant *aided or abetted*, counseled, commanded, induced, procured, or willfully caused." *Id*. § 2K2.1 cmt. n.13(B) (latter emphasis added).  Of course, the evidence in this case shows that the defendants either personally participated in, *or aided and abetted*, the trafficking of two or more firearms, and they have in essence not argued otherwise.  Accordingly, we conclude that the district court did not err in also applying this enhancement.

## VII

Finally, the defendants contend that the district court committed reversible error by imposing two conditions of supervised release in the written judgments entered against them that differed from the articulation of those conditions made by the court orally during sentencing, in violation of *United States v. Rogers*, 961 F.3d 291 (4th Cir. 2020).  In view of this error, they request that we vacate the sentence and remand their cases for plenary resentencing.

24

The applicable principles are grounded in statute and reiterated in the Sentencing Guidelines. And they are consistently applied in our decisions with respect to them.

When a court imposes a term of supervised release, it must impose a list of conditions that are *mandated* by 18 U.S.C. § 3583(d) ("mandatory conditions"). The statute also provides that the court *may* impose "discretionary conditions" so long as they comply with the requirements of § 3583(d). And, in either event, the probation office must provide the defendant with "a written statement" of the conditions that have been imposed. 18 U.S.C. § 3583(f).

The Sentencing Guidelines restate the mandatory conditions that the district court must impose for all terms of supervised release. *See* U.S.S.G. § 5D1.3(a). As to discretionary conditions, the Guidelines provide a list of 13 "standard conditions" that the district court *may* apply, as appropriate. *Id*. § 5D1.3(c). The Guidelines also list as discretionary other "special conditions" that may be relevant to particular circumstances. *Id*. § 5D1.3(d), (e).

Because the "mandatory conditions" are a necessary part of any sentence that imposes supervised release and defendants are appropriately on notice of them, a district court "need not orally pronounce mandatory conditions at sentencing." *Rogers*, 961 F.3d at 296. But as to all "discretionary conditions," which the court may impose as they relate to sentencing factors, the default requirement is that the district court read all discretionary conditions at sentencing. *See id*. at 297–98. Nonetheless, we have carved out a limited exception, recognizing "that a district court may satisfy its obligation to orally pronounce discretionary conditions through incorporation." *Id*. at 299. For instance, "standard

25

conditions" identified by the Sentencing Guidelines and adopted by local standing orders of court may be imposed by incorporation simply by explicitly referencing them during sentencing. This incorporation by reference is authorized because the defendant is put on notice at his sentencing hearing "that a certain set of conditions will be imposed on his supervised release," even if each standard condition is not read aloud to him. *Id.*; *see also United States v. Singletary*, 984 F.3d 341, 346 (4th Cir. 2021).

Finally, we have held that the conditions imposed orally during sentencing reflect the controlling conditions imposed by the court and that where the written judgment includes discretionary conditions that were not orally pronounced, or where there is an inconsistency between the two, the defendant's sentence must generally be vacated. *See Singletary*, 984 F.3d at 346; *United States v. Lassiter*, 96 F.4th 629, 639–40 (4th Cir. 2024).

At each sentencing here, the district court incorporated by reference the 13 standard conditions of supervised release that the district court had adopted with a standing order. And those 13 conditions are virtually verbatim the 13 standard conditions in the Sentencing Guidelines. *See* U.S.S.G. § 5D1.3(c). At issue here are standard conditions 6 and 7, which provide:

> [6] You must allow the probation officer to visit you at any time at your home or elsewhere, and you must permit the probation officer to take any items prohibited by the conditions of your supervision that he or she observes in plain view.

> [7] You must work full time (at least 30 hours per week) at a lawful type of employment, unless the probation officer excuses you from doing so. If you do not have full-time employment you must try to find full-time employment, unless the probation officer excuses you from doing so. If you plan to change where you work or anything about your work (such as your position or your job responsibilities), you

26

must notify the probation officer at least 10 days before the change. If notifying the probation officer at least 10 days in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.

District of Maryland Standing Order 2020-13, Misc. No. 00-308 (filed June 10, 2020). Moreover, these standard conditions were also included in full in the sentencing recommendation made by the probation officer to the district court, which was provided to the defendants as part of their presentence reports. And each defendant confirmed at sentencing that he had reviewed his report.

During sentencing, the district court told each defendant clearly that it was imposing both the mandatory and standard conditions. Specifically, it told Tita:

You shall comply with all of the mandatory and standard conditions of supervised release, as well as the additional conditions. The mandatory and standard conditions I need to carefully *summarize* for you as required by recent case authority of the United States Court of Appeals for the Fourth Circuit.

(Emphasis added). It told Nji that it was going to place him on supervised release for the total period of two years "with the mandatory conditions, which I must go over with you clearly, and standard conditions, and additional conditions." And it told Fonguh, "You shall comply with all those conditions, both the mandatory and standard conditions, as well as certain additional conditions that I'm going to note."

The court also chose to summarize some conditions it thought important, specifically summarizing standard conditions 6 and 7. Regarding standard condition 6, it told Tita that he "must allow the probation officer to visit you at any time at your home or elsewhere"; it told Nji similarly that he "must allow the probation officer to visit you at

27

any time at your residence"; and it also told Fonguh that he "must allow the probation officer to visit you at any time." The court did not, however, read the entire condition. And as for the work requirement in condition 7, the court told Tita and Nji that they "must work full time at a lawful type of employment," and it told Fonguh that he "must make every effort to work full-time, at least 30 hours per week." Again, the court did not read the entire condition.

Following sentencing, the court entered judgments that contained the full text of the standard conditions as incorporated by the court, which included the full text of standard conditions 6 and 7.

The defendants now argue that the district court's practice in summarizing a portion of the conditions violated the ruling we adopted in *Rogers* because the written judgment was more complete than the oral summary.

We conclude, however, that by expressly incorporating the standard conditions adopted by the standing order of the district court, the court properly announced the standard conditions orally in court, and the written judgment that included the standard conditions did not violate *Rogers*. *See United States v. Turner*, 122 F.4th 511, 519 (4th Cir. 2024) (holding that because "the district court incorporated the conditions as set forth in the PSR" during the sentencing hearing, and because those incorporated conditions were "a word-for-word match with those in Turner's written judgment," that was "enough to satisfy the dictates of our *Rogers* decision").

The defendants, however, focus on the district court's summarization of some conditions, failing to acknowledge the earlier incorporation by reference to the standard

28

conditions. Because the summarizations were just that — summaries — they were not as fulsome as the standard conditions being summarized. But that does not, we conclude, violate *Rogers*, as the defendants argue. Indeed, in *Turner*, we specifically rejected a defendant's attempt to "fault[] the district court for going further" and, after incorporating the standard conditions, proceeding to also read them aloud with slight deviations in language. 122 F.4th at 519–20. While there certainly may arise circumstances where a problematic ambiguity could result from providing summarizations, *see United States v. Bullis*, 122 F.4th 107, 119 (4th Cir. 2024), the record here shows that the district court made clear that it was expressly incorporating the "standard conditions" that the defendants had previously received and that during sentencing it was only purporting to "*summarize*" some of the conditions that it thought were important to the defendants. Given the unambiguous express incorporation of the standard conditions in these cases, we do not fault the district court for then proceeding to summarize some conditions for the defendants in a manner that omitted details.

\*      \*      \*

Having fully considered the defendants' challenges to their convictions and sentences and finding them unpersuasive, we affirm the judgments of the district court.

AFFIRMED